Gilbert **GONZALES, Plaintiff–Appellant,**

v.

**POLICE DEPARTMENT, CITY OF SAN JOSE, CALIFORNIA, Defendant–Appellee.**

No. 88–2805.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 16, 1989.

Decided April 18, 1990.

---

James L. Dawson, Mesirow, Fink, Rosenblatt & Dawson, San Jose, Cal., for plaintiff-appellant.

Joan R. Gallo, City Atty., Andrea Bryan Ferguson, Sr. Deputy City Atty., George Rios, Asst. City Atty., San Jose, Cal., for defendant-appellee.

Before GOODWIN, Chief Judge, and PREGERSON and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

■ Gilbert Gonzales, a Hispanic police officer employed by the police department of the city of San Jose (the "Department"), appeals a judgment denying his claim of racial discrimination. He sued under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Gonzales asserts that the district court's finding that the city did not intentionally discriminate against him is based upon errors of law. We agree. The court's failure to consider San Jose's repeated violations of its own Affirmative Action Plan and the court's reliance on statistical evidence regarding promotions of Hispanics *after* Gonzales filed his complaint constitute material legal errors. Such errors are sufficiently serious to warrant a remand to enable the district judge to reconsider his decision. Thus, we vacate the judgment below.

Gonzales has been employed as a police officer by the city of San Jose since 1971, and during the next twelve years received over thirty written commendations for his work. His varied job assignments have included the Patrol Division, the MERGE Unit, Background Investigations, and the Burglary Prevention Unit.[1] In 1980, Gonzales decided to seek promotion to the rank of Police Sergeant. He passed the written and oral examinations and was placed on the eligibility list for promotion, a list which was in effect from October 24, 1980, to October 24, 1982.

In 1977, the Department switched from the "Rule of 3" to the "Rule of 10," a policy change designed to open up more positions to qualified minorities and women candidates. Under the Rule of 10, the Department would consider the next ten rather than the next three candidates on its eligibility list whenever a vacancy occurred. Furthermore, in December 1980, pursuant to a consent decree, the city of San Jose

---

1. Gonzales has never received any formal or informal reprimands nor has he been the target of any Internal Affairs complaint or investigation. However, members of the Department's command staff testified that they had heard that he had a drinking problem, was "heavy handed" in the field, and lacked "command presence." Gonzales points out that these rumors were nev-er substantiated nor corroborated by the command staff. While the evidence concerning these allegations is far from persuasive, our review of the record reveals that it is sufficient to support a conclusion that the command staff had a reasonable, good faith belief that appellant experienced a problem with alcohol at the time of his divorce.

adopted an Affirmative Action Plan. This Plan requires "positive and innovative action to assure that all possible barriers to employment of members of minority groups ... are eliminated." Specifically, the Plan mandates that the Police Chief, "[i]n cooperation with the City Affirmative Action Officer, will develop and implement a Departmental Affirmative Action Plan which will include goals and timetables," that "[m]inorities and women will be included on screening, interviewing committees, and oral boards," and that when a non-minority is to be promoted over an eligible minority candidate, the Department shall submit "a written statement as to the reasons for the nonselection" to the Affirmative Action Officer. A disagreement between the Affirmative Action Officer and the Department over the promotion leads to the suspension of the selection process, and the matter is referred to the City Manager, who is the final authority on all selections. Gonzales is a member of a protected group and the provisions of the Plan were in effect at the time he sought promotion to the rank of Police Sergeant.

The Department, on four separate occasions—in December 1981, April 1982, July 1982, and September 1982—declined to promote Gonzales. As the district court noted, the Department promoted some individuals who were ranked higher on the eligibility list, as well as some who ranked lower. Gonzales filed an EEOC charge and was issued a right to sue notice. Initially, the case proceeded under both the disparate treatment and disparate impact theories available under Title VII. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). However, prior to trial, the latter theory was dropped.

At trial, the appellant presented evidence that the Department did not follow the affirmative action procedures of the Affirmative Action Plan it had adopted as part of a consent decree. He also presented evidence that from 1980 until 1982, only one out of eleven officers promoted to Sergeant was Hispanic. Gonzales also introduced evidence to establish that the nega-

tive information the command staff had about him was false. After a two day bench trial, the district judge issued comprehensive findings of fact and conclusions of law, holding that "[a]t no time did [the Department] intentionally discriminate against plaintiff on account of his national origin." While considering in detail the subjective factors which the command staff took into account, the judge made no mention of the San Jose Affirmative Action Plan; also he relied upon promotion rates for Hispanics during the period after appellant filed his complaint. On the basis of these errors, we vacate and remand for reconsideration.

There is no indication in the record that the district court took into account the fact that there were material, uncontroverted, and repeated violations of San Jose's Affirmative Action Plan in this case. Under the Plan, adopted pursuant to a consent decree, the Department was plainly required to notify the city's Affirmative Action Officer in writing each time it promoted a non-minority over Gonzales. On each of the four occasions that Gonzales was passed over, the Department failed to comply with this requirement. Inasmuch as the Affirmative Action Officer is empowered both to request that the Department change its promotion decision and to refer the matter to the San Jose City Manager if the Department, over her request, refuses to change its mind, the Department's repeated failure to afford the requisite affirmative action notice was certainly material to Gonzales' Title VII claim. Indeed, there might never have been a need for the claim had the Police Department followed the city's plan—even once.

Gonzales extensively discussed the city's failure to follow the judicially approved affirmative action plan in his post-trial brief and included a detailed discussion of the issue in his proposed findings. The district court, however, in its own otherwise careful and seemingly comprehensive findings, did not mention the issue at all. Other courts have held that "evidence that an employer has failed to live up to an affirmative-action plan is relevant to the

question of discriminatory intent...." *Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465, 472 (8th Cir.1984). In *Craik*, the Eighth Circuit reversed the magistrate's finding that the university had not discriminated against female faculty members either as to the class or as to the individuals. "The magistrate did not make findings on [the university's failure to follow its own affirmative action plan], and we cannot be sure that he gave this evidence proper weight in considering the plaintiffs' substantive claims.... This is another factor in our conclusion that the magistrate clearly erred in rejecting certain claims of the plaintiffs." [2] *Id.* at 473. *See also Yatvin v. Madison Metro. School Dist.*, 840 F.2d 412, 415–16 (7th Cir.1988) (more than an occasional violation of an affirmative action plan might help support a discrimination claim, but "violation of the plan would not be sex discrimination as such"); *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1135 n. 14 (8th Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981) ("Evidence, such as Teletype's failure to live up to its affirmative action program and its failure to support its affirmative action director, is also relevant to discerning the Company's attitude regarding race."); *Chang v. University of Rhode Island*, 606 F.Supp. 1161, 1183 (D.R.I.1985) ("Although the failure of an employer to adopt or effectively to implement an affirmative action plan may be probative of discriminatory intent, the lack of an affirmative action plan or the poor implementation of one does not, by itself, prove classwide discrimination."). We agree that evidence that the employer violated its own affirmative action plan may be relevant to the question of discriminatory intent. We note, however, that failure to follow an affirmative action plan is not per se a prima facie violation of Title VII. *See Yatvin*, 840 F.2d at 415–16.

In the case at hand, there is *no* mention of the extensive testimony on the Department's violation of the San Jose Affirmative Action Plan. Based on the nature and extent of Gonzales's argument and the character of the court's written findings, the record supports Gonzales' contention that the district court erred in not considering a highly relevant and probative aspect of his case.

The second error committed by the district court is equally significant. The court's findings of fact demonstrate that it relied on statistical evidence which tended to show that the Police Department had a generally good record with regard to the promotion of Hispanics from June 1977 to March 1987. Statistical evidence of this sort would be appropriate as a basis for the court's decision were it not for the fact that most of the evidence the court considered concerns a period *after* Gonzales filed his initial complaint. Looking at the Department's record of performance after the courts have been asked to intervene is irrelevant to the merits of a discrimination claim and can be highly misleading. In a long line of Title VII cases, other circuits have recognized that the fact that improvements or advancements undertaken after lawsuits have been initiated drastically reduces the probative value of such evidence.

**2.** As Justice Stevens noted in his concurring opinion in *Johnson v. Transportation Agency*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), affirmative action programs serve as both "a shield and a sword."

Antidiscrimination measures may benefit protected groups in two distinct ways. As a sword, such measures may confer benefits by specifying that a person's membership in a disadvantaged group must be a neutral, irrelevant factor in governmental or private decisionmaking or, alternatively, by compelling decision makers to give favorable consideration to disadvantaged group status. As a shield, an antidiscrimination statute can also help a member of a protected class by assuring decisionmakers in some instances that, when they elect for good reasons of their own to grant a preference of some sort to a minority citizen, they will not violate the law.
480 U.S. at 642, 107 S.Ct. at 1457–58.

A lower court has read this language to stand for the proposition that "once an employer adopts an [affirmative action program] and benefits from it as a shield from claims of discrimination, employees arguably protected by the plan can use it as a sword to challenge the propriety of their treatment." *Morman v. John Hancock Mutual Life Ins. Co.*, 672 F.Supp. 993, 995 (E.D.Mich.1987). In other words, the failure of an employer to follow its own affirmative action program constitutes significant evidence in a Title VII suit against the employer. *Contra Yatvin v. Madison Metro. School Dist.*, 840 F.2d 412, 416 (7th Cir.1988) (disagreeing with the suggestion made in *Morman* ).

That minority employees were "promoted just before trial ... does not constitute a defense to plaintiffs' charges, nor does it moot the issues.... '[R]esearch leads us to conclude that often the acts relied upon as evidencing good faith are taken in response to the lawsuit filed by the discriminatee. Such actions in the face of litigation are equivocal in purpose, motive and permanence.'" *Gamble v. Birmingham Southern Railroad Co.*, 514 F.2d 678, 683 (5th Cir.1975) (quoting *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1376–77 n. 36 (5th Cir.1974)). *See also EEOC v. Monarch Machine Tool Co.*, 737 F.2d 1444, 1449 (6th Cir.1980) (Although defendant and the district court in its opinion relied heavily upon the corrective practices taken by defendant since the filing of plaintiff's complaint, the voluntary changes effectuated by the defendant " 'do not render moot the questions presented in the litigation or make judicial sanctions inappropriate'.") (quoting *EEOC v. New York Times Broadcasting Services, Inc.*, 542 F.2d 356, 361 (6th Cir.1976)); *Rowe v. General Motors Corp.*, 457 F.2d 348, 359 (5th Cir.1972) ("protestations or repentance and reform timed to anticipate or blunt the force of a lawsuit offer insufficient assurance that the practices sought to be enjoined will not be repeated") (quoting *Cypress v. Newport News General & Nonsectarian Hosp. Assn.*, 375 F.2d 648, 658 (4th Cir.1967)); *Jenkins v. United Gas Corp.*, 400 F.2d 28, 33 (5th Cir.1968) ("[s]uch a last minute change of heart is suspect, to say the least"). The cases cited generally cast substantial doubt on the relevance of post-complaint conduct when the issue is whether the employer's practices should be enjoined. Its lack of relevance to the issue before us is even more apparent. Subsequent hiring or promotion practices are clearly not relevant to the question of whether discrimination occurred prior to the commencement of a Title VII action.[3] Curative measures simply do not tend to prove that a prior violation did not occur. Thus, it was error for the district court to consider the statistical evidence introduced by the city and error for the court to rely upon it in its findings of fact and conclusions of law.

We need not decide whether either of the district court's errors would by itself warrant reversal. Considered together, there is no doubt that a remand is required in light of the cumulative effect of the two material errors. While there may be substantial evidence in the record that could support a decision that the city acted in good faith, there is also evidence that might support a finding of discriminatory intent. It is the district judge's function to make the appropriate factual determination as to motivation after considering *all* the relevant evidence, and only that evidence. Accordingly, the decision is vacated and the case is remanded to the district court for reconsideration in light of this opinion.

VACATED AND REMANDED FOR FINDINGS NOT INCONSISTENT WITH THIS OPINION.

---

**3.** An exception may exist under certain limited circumstances—for example, when a defendant seeks to use the post-complaint figures or practices to explain the significance or effect of pre-complaint data. Such is not the case here however.