[No. B100927. Second Dist., Div. Four. Nov. 21, 1996.]

VIBEKE CLOUD, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LITTON INDUSTRIES, INC., Real Party in Interest.

**COUNSEL**

Gronemeier & Barker, Dale L. Gronemeier and Alexander A. Molina for Petitioner.

No appearance for Respondent.

Victoria T. McGhee, John W. Patton, Jr., William C. Black, Mark C. Sherwood and Marilyn Wade for Real Party in Interest.

## OPINION

**EPSTEIN, J.**—This is a discovery dispute in the context of a claim of gender-based discrimination. The petitioner, plaintiff in the trial court proceedings, served a demand for production pursuant to Code of Civil Procedure section 2031. In it, she sought discovery of documents relating to the affirmative action plans of real party in interest Litton Industries, Inc. (Litton), one of the defendants below. Litton objected to discovery about its affirmative action plans. Among other things, it claimed that some of the documents were protected by the "self-critical analysis privilege." Petitioner's motion to compel was denied on the basis of public policy. The result was to deny petitioner discovery of the affirmative action plans themselves as well as the self-critical analyses. The court's finding that judicially enforced discovery of the documents would offend public policy amounted to an adjudication that they are privileged. Both petitioner and Litton have treated it that way in their briefing.

We hold the documents are not protected by any privilege recognized in this state. In California, privileges are created by the Legislature, not by courts. None apply to the documents at issue. Nor do the parties suggest that a privilege exists either under the state or national Constitution or that the documents are protected by federal law applicable under the supremacy clause. Since the documents sought are not privileged and are relevant to issues in the case, we conclude the trial court erred in denying petitioner's motion to compel. We shall direct the court to vacate that order and to issue another, allowing the discovery.

### FACTUAL AND PROCEDURAL SUMMARY

Because of the nature of the issues presented, it is not necessary to provide a detailed discussion of the factual matrix in which they arise. The following brief summary is sufficient for purposes of the discussion that follows.

Petitioner, Vibeke Cloud, held a senior financial position as an employee of real party Litton and Western Atlas, Inc. She had been an employee of Litton or Western Atlas since 1981. Western Atlas was an affiliated entity to Litton and apparently was spun off and became independent in March 1994. When the position of controller for Western Atlas became available in 1993, she applied for it. She claims she was denied promotion to the post because of her gender, and that both Litton's and Western Atlas's actions violated her rights under the state Fair Employment and Housing Act (Gov. Code, § 12970 et seq.) and article I, section 8 of the California Constitution (declaring that no person may be disqualified from entering or pursuing

employment on account of sex or other specified bases). She also alleged a public policy violation by reason of retaliatory and discriminatory conduct against her. Litton and Western Atlas denied these allegations.

At an early stage in the litigation, petitioner propounded a demand for production to Litton, as authorized by section 2031, subdivision (a) of the Code of Civil Procedure. (All further statutory references are to that code except where another code is identified.) Only one of the thirty-six demands in this document is material to our review. Demand 33 asked for "[a]ll writings or recordings which evidence or relate to Litton's affirmative action plan from 1981 to the present." ("The present" was August 1995, when the discovery demand was sent.) A timely response by Litton objected to demand 33 as vague and ambiguous, not stated with enough particularly to enable formulation of a rational response, and not relevant or calculated to lead to discovery of relevant evidence. Litton also raised the attorney-client privilege and the work-product doctrine. (No objection was raised as to overbreadth.) Some three months later, Litton served supplemental responses to various parts of the demand for production. In them, and for the first time, it asserted the self-critical analysis privilege with respect to demand 33. It refused to produce the discovery requested and at issue in our review.

Litton's response was followed by efforts to resolve the discovery disputes identified by the exchange and, finally, by petitioner's motion to compel. The issues underlying demand 33 were thoroughly briefed in the written points and authorities presented to the trial court. On March 14, 1996, the trial court ruled on the motion, granting portions of it and denying others. With respect to the affirmative action materials, the court said only that the request was "[d]enied, as contra public policy." Petitioner applied to this court for extraordinary relief with respect to this discovery. Litton opposed it. We issued an alternative writ. Having considered the positions of the parties, we conclude that petitioner is entitled to discovery of Litton's affirmative action plans and self-critical analyses in force or relating to the time she was employed by it. We turn to the merits of the discovery issue.[1]

---

[1]Petitioner argues that Litton cannot be heard to claim the self-critical analysis privilege because it did not assert it in its initial response. Litton argues that its failure to do so was caused by an initial uncertainty in the demand, and that it only realized the demand extended to the self-critical analyses after discussions with petitioner's counsel. The statute provides for waiver of claims for privileges that are not timely asserted, but it also allows trial courts to grant relief from the waiver for good cause. (§ 2031, subd. (k).) While neither Litton nor the court followed the formal statutory procedure for relief, we are satisfied the court

## Discussion

■ The demand for production that gave rise to the present petition encompasses Litton's affirmative action plans themselves. Almost all of the briefing, however, centered on the self-critical analyses. We shall return briefly to the affirmative action plans at the end of our discussion. We begin, however, with the self-critical analysis issue.

In its broadest terms, the privilege has been stated to apply to any critique by a person or entity of its own operations, policies, or processes. (See Note, *The Privilege of Self-Critical Analysis* (1983) 96 Harv. L.Rev. 1083.) Our treatment of the issue, like those of the parties, is not nearly so broad. As we discuss it, self-critical analyses are those conducted by federal contractors pursuant to equal employment opportunity requirements imposed on them by federal authority. Their obligations stem from title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), as implemented by several executive orders and administrative regulations. The best known of the executive orders, No. 11246, requires most federal contractors to establish and maintain affirmative action plans. These plans prohibit discrimination based on race, sex and other specific grounds, and require affirmative efforts to attract and encourage the employment of members of underrepresented groups. Among other things, contractors are required to candidly discuss their hiring, firing and promotion practices, and to be self-critical. (41 C.F.R. §§ 60-1.40(a), 60-2.10 to 2.12 (1995).) It is these self-critical analyses, adjuncts to affirmative action plans and required of contractors by federal executive orders and regulations, that comprise the subject matter of the privilege issue in this case. It is undisputed that Litton is a federal contractor, subject to these requirements.

The privilege is said to have its origins in protections afforded records of hospital peer review bodies (*Bredice* v. *Doctors Hospital, Inc.* (D.D.C. 1970) 50 F.R.D. 249, affd. (D.C. Cir. 1973) 479 F.2d 920), and was first applied to employment discrimination in *Banks* v. *Lockheed-Georgia Company* (N.D.Ga. 1971) 53 F.R.D. 283. (See *Williams* v. *Vulcan-Hart Corp.* (W.D.Ky. 1991) 136 F.R.D. 457, 459.) Since then, its development has been in federal courts, which are anything but uniform in their views about its merits.

The basis for the privilege is the assumption that it is necessary to encourage the candor with which self-critical analyses are to be prepared by federal contractors. As explained by one court, "employers must be encouraged to be candid and forthright in assessing their employment practices and

---

concluded that Litton presented good cause for consideration of its privilege claim. The trial court reviewed it on the merits, and we shall as well.

setting goals and timetables for eradicating policies deemed to be discriminatory in operation or effect. If subjective materials constituting 'self-critical analysis' are subject to disclosure during discovery, this disclosure would tend to have a 'chilling effect' on an employer's voluntary compliance with equal employment opportunity laws." (*Webb* v. *Westinghouse Elec. Corp.* (E.D.Pa. 1978) 81 F.R.D. 431, 433; see also *O'Connor* v. *Chrysler Corp.* (D.Mass. 1980) 86 F.R.D. 211, 217; *Coates* v. *Johnson & Johnson* (7th Cir. 1985) 756 F.2d 524, 551; *Jamison* v. *Storer Broadcasting Co.* (E.D.Mich. 1981) 511 F.Supp. 1286, 1296, affd. in part and revd. in part (6th Cir. 1987) 830 F.2d 194; and see generally, Flanagan, *Rejecting a General Privilege for Self-Critical Analysis* (1983) 51 Geo. Wash. L.Rev. 551; Comment, *Stimulating Corporate Self-Regulation—The Corporate Self-Evaluative Privilege: Paradigmatic Preferentialism or Pragmatic Panacea* (1993) 87 Nw.U. L.Rev. 597; Note, *The Privilege of Self-Critical Analysis, supra,* 96 Harv. L.Rev. 1083.)

Other courts have raised serious questions about the underlying assumption that disclosure of self-critical analyses would discourage self-critical activity, and have refused to recognize the privilege. (See *Witten* v. *A. H. Smith & Co.* (D.Md. 1984) 100 F.R.D. 446, 452; *Hardy* v. *New York News, Inc.* (S.D.N.Y. 1987) 114 F.R.D. 633, 640, 643.) Those who advocate the privilege have been particularly unsuccessful in courts within the jurisdiction of the Ninth Circuit. (See *Gonzales* v. *Police Dept., City of San Jose, Cal.* (9th Cir. 1990) 901 F.2d 758, 759 [Ninth Circuit does not recognize the privilege]; *Griffith* v. *Davis* (C.D.Cal. 1995) 161 F.R.D. 687, 701, fn. 17 [no Ninth Circuit case has explicitly adopted the privilege, nor has any found a document protected based on the privilege]; *T.W.A.R., Inc.* v. *Pacific Bell* (N.D.Cal. 1992) 145 F.R.D. 105, 108 [privilege not recognized by Ninth Circuit]; *Pagano* v. *Oroville Hosp.* (E.D.Cal. 1993) 145 F.R.D. 683, 690 [peer review case; Ninth Circuit declines to embrace the privilege]; but see *Penk* v. *Oregon State Bd. of Higher Educ.* (D.Ore. 1982) 99 F.R.D. 506, 507 [evaluative portions of reports held not subject to discovery].) The United States Supreme Court considered and rejected a similar privilege claim—for peer review evaluations in university tenure decisions in *University of Pennsylvania* v. *EEOC* (1990) 493 U.S. 182 [107 L.Ed.2d 571, 110 S.Ct. 577].

Litton argues that "California courts which have previously considered the self-critical analysis privilege have implicitly held that it is valid." The assertion is not correct. First, the "California courts" to which Litton refers are federal courts applying federal law with respect to privilege. Neither of the parties has cited a California state decision supporting—or even discussing—the privilege, and we have found none. This case appears to be one of first impression by a California court.

Neither of the two "California" federal cases cited by Litton supports its claim that the privilege is implicitly upheld. In the first, *E.E.O.C.* v. *General Telephone Co. of Northwest* (9th Cir. 1989) 885 F.2d 575, certiorari denied 498 U.S. 950 [112 L.Ed.2d 332, 111 S.Ct. 370], the court held that "even if" the privilege were recognized, it was inapplicable under the facts presented. (The trial court had upheld an employer's assertion of the privilege to exclude documents related to its equal opportunity efforts, but the employer had then introduced voluminous documents on that issue in its case-in-chief; the appellate court reversed and held that the excluded documents were relevant on the issue of the employer's intent.)

The other is *Dowling* v. *American Hawaii Cruises, Inc.* (9th Cir. 1992) 971 F.2d 423. The *Dowling* court recognized the possible unfairness of requiring a party to turn over to an opposing litigant "self-damning assessments that the government has required it to prepare." (*Id.* at pp. 426-427.) But the court also pointed out that the circuit had not yet considered whether the privilege exists, and it then proceeded to find that no basis to preclude production of the documents at issue (minutes of a ship's safety committee) even "assuming" the privilege did exist. (*Id.* at p. 425.)

■ There is a major difference between state and federal jurisprudence on the law of privilege. The federal rule is that, "[e]xcept as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege . . . shall be determined in accordance with State law." (Fed. Rules Evid., rule 501.) This provision allows federal courts to recognize privileges, or not, under the developing common law "in the light of reason and experience," in cases where Congress has not acted and in which state law does not apply. (See *Jaffee* v. *Redmond* (1996) __ U.S. __, __, fn. 3 [135 L.Ed.2d 337, 342, 116 S.Ct. 1923, 1926].)

California law is different. The basic rule, codified in Evidence Code section 911, is that "[e]xcept as otherwise provided by statute: [¶] . . . [¶] (b) No person has a privilege to refuse to disclose any matter or to refuse to produce any writing, object, or other thing." (Evidence Code section 175 defines "person" comprehensively to include business entities such as the real party corporations in this case.) "[T]he privileges contained in the Evidence Code are *exclusive* and the courts are not free to create new

privileges as a matter of judicial policy." (*Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652, 656 [125 Cal.Rptr. 553, 542 P.2d 977]; *Garstang* v. *Superior Court* (1995) 39 Cal.App.4th 526, 532 [46 Cal.Rptr.2d 84] [same].)

The Evidence Code recognizes 13 privileges, each in a separate article. (Evid. Code, §§ 930-1063.) The self-critical analysis privilege is not among them. Other statutory provisions, in the Evidence Code and in other laws, give explicit or at least implicit recognition to other privileges and exclusions. (See, e.g., Rev. & Tax. Code, § 19542 [disclosure of tax returns]; Pen. Code, § 832.7 [police personnel records].) Evidence Code sections 1157-1157.7 are particularly instructive. These provisions protect several specified health care provider peer review evaluations. The evaluations described are roughly similar to the self-critical analyses at issue in this case. The existence of these statutes demonstrates, if further demonstration is needed, that the Legislature is fully aware of the means to protect the information Litton wishes to exclude from disclosure. It has not enacted a law that expressly protects its self-critical analyses.

 Nevertheless, Litton claims that three of the statutory privileges extend far enough to protect its documents. These are the lawyer-client privilege, the work-product doctrine (often, and correctly, described as a privilege), and the trade secret privilege. None is applicable to this case.

The lawyer-client privilege protects confidential communications between a client and the client's attorney. (Evid. Code, § 954.) Other than a bare assertion that the privilege applies, and has not been waived, Litton has offered nothing to support its application to self-critical analyses. As Litton itself has recognized, preparation of the self-critical analyses of affirmative action policies and practices is required by federal law, and the analyses themselves are available for inspection by federal authorities. There is no suggestion that the analyses, in whole or in part, are in the form of or constitute confidential communications between attorney and client.[2]

The same is true of the attorney's work-product claim. Attorney work product is protected from discovery (§ 2018), but there is nothing to suggest that the self-critical analyses are attorney work product. Even if an attorney

---

[2]In our discussion of this and other privileges, we address disclosure of the affirmative action plans themselves, the self-critical analyses, and other documents sought *other than* memorializations of confidential communications between attorney and client, and attorneys' "impressions, conclusions, opinions, or legal research or theories." (§ 2018, subd. (c).)

prepared them, the analyses are conducted and written with the expectation that they will be revealed, at least to the federal authorities. As with the lawyer-client claim, no basis has been presented to justify withholding the analyses on the basis of attorney's work product.

The final claim is that the self-critical analyses constitute trade secrets, invoking the privilege codified in Evidence Code section 1060 et seq. This claim has been waived because Litton did not assert it at any stage of the trial court proceedings, as it could have done under section 2031, subdivision (e)(5). Beyond that, we observe that Litton has presented nothing beyond the bare claim of privilege in its answer to the writ petition. In any event, the privilege is not absolute, and a trial court may order disclosure subject to such protective orders as may be appropriate. (§ 2031, subd. (e)(5).)

This leaves Litton's challenge to the relevance of the discovery sought. Federal cases have uniformly held that an employer's affirmative action plan, and self-critical analyses prepared with respect to that plan, are relevant in employment discrimination cases where the discrimination claimed would violate federal law. (See, e.g., *Gonzales* v. *Police Dept., City of San Jose, Cal., supra,* 901 F.2d 758; *Lowe* v. *City of Monrovia* (9th Cir. 1985) 775 F.2d 998, 1007, fn. 6; *O'Connor* v. *Chrysler Corp., supra,* 86 F.R.D. at p. 217; *Hardy* v. *New York News, Inc., supra,* 114 F.R.D. at p. 641; *Stender* v. *Lucky Stores, Inc.* (N.D.Cal. 1992) 803 F.Supp. 259, 330.) As these decisions and others have pointed out, a showing that Litton has failed to adhere to its own affirmative action plan as it applies to petitioner, if that showing can be made, is probative to her claim of gender bias. Whether the information she seeks would establish what she hopes is, of course, something that we cannot know and do not assume. But the matter is "relevant" for purposes of discovery because it "appears reasonably calculated to lead to the discovery of admissible evidence." (§ 2017, subd. (a).)

DISPOSITION

Let a writ of mandate issue under seal of this court directing the superior court to vacate its order of March 14, 1996, insofar as it denies discovery of items sought by demand 33 of petitioner's demand for production, and further directing that court to issue a new and different order compelling Litton to produce the documents sought by that demand, excepting only memoranda (not including the affirmative action plans themselves and self-critical analyses prepared with respect to those plans) that constitute confidential lawyer-client communications not otherwise disclosed, and

attorney's work product not otherwise disclosed. Petitioner to have her costs on appeal.

Vogel (C. S.), P. J., and Hastings, J., concurred.

On December 16, 1996, the opinion was modified to read as printed above.