**UNION PACIFIC RAILROAD COMPANY, Plaintiff–Appellee,**

v.

**Brent MOWER, Defendant–Appellant.**

No. 98–36140.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 8, 2000.

Filed July 19, 2000.

Paul S. Bovarnick, Rose, Senders and Bovarnick, Portland, Oregon, for the defendant-appellant.

Thomas R. Jayne, Thompson Coburn, St. Louis, Missouri, and Thomas W. Brown, Timothy J. Coleman, and Randall B. Kester, Cosgrave, Vergeer & Kester, Portland, Oregon, for the plaintiff-appellee.

Before: NOONAN, GRABER, and FISHER, Circuit Judges.

FISHER, Circuit Judge:

■ Brent Mower is a former employee of Union Pacific Railroad Company ("UP"). UP obtained a broad injunction against Mower, prohibiting him from disclosing or revealing to third parties any confidential information he obtained while employed by UP. Mower appeals the issuance of that injunction. The basis of the district court's jurisdiction was 28 U.S.C. § 1332, and we have jurisdiction pursuant to 28 U.S.C. § 1291.[1] We reverse and vacate the injunction.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Resignation Agreement*

UP employed Mower from 1979 to 1992. During that time, Mower rose from a low-level claims adjuster position to Director of Occupational and Environmental Issues. In his management position, Mower's primary responsibility was the investigation and resolution of thousands of occupational illness claims filed against UP. Mower worked closely with UP's legal department on certain issues and, for a portion of his career, was considered a member of the legal department.

In 1992, UP asked Mower to resign, and the parties entered into a resignation and consulting agreement on November 20, 1992 (the "Resignation Agreement"). The Resignation Agreement provided that Mower would serve as a consultant to UP for a period of three years. The Resignation Agreement also stipulated that, from November 1992 until December 31, 1995, Mower would not (1) reveal UP's confidential and privileged information or any other information "harmful" to UP's best interests, (2) "communicate with anyone with respect to the business or affairs of [UP]," or (3) consult with any person asserting claims against UP. It is undisputed on appeal that Mower complied with the terms of the Resignation Agreement through December 31, 1995.

### B. *The Idaho Case*

In May 1997, Mariano Ybarra filed a complaint against UP in Idaho, alleging that he had sustained personal injuries while employed at UP and that such injuries were the result of UP's negligence. Ybarra moved to supplement his witness list during March 1998 to add Mower as a witness. In a sworn affidavit, Mower stated that he would testify about a particular study he conducted during 1989, relating

---

1. Mower argues that the district court lacked jurisdiction because UP failed to establish adequately that the amount in controversy exceeded $75,000. We are not persuaded. The value to UP of protecting its confidential information from disclosure far exceeded the requisite jurisdictional amount. In addition, when UP filed its complaint, Mower was listed as a witness in several state court cases in Colorado and Idaho, and in one case alone the claim was in excess of $750,000. *Cf. Budget Rent–A–Car, Inc. v. Higashiguchi,* 109 F.3d 1471, 1473 (9th Cir.1997) ("To justify dismissal, '[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount.'" (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938)) (alteration in original)).

generally to Ybarra's type of injury, and about a position paper he prepared in connection with the study and presented to senior management at UP. UP objected, claiming that Mower's proffered testimony related to privileged information. The Idaho trial court deferred ruling on the issue to afford UP's counsel the opportunity to depose Mower.

## C. *The Injunction*

■ In April 1998, while the issue of Mower's testimony was still pending in the Idaho case, UP filed its complaint for an injunction against Mower in the federal district court in Oregon.[2] In its complaint, UP argued that, if allowed to testify in the Idaho case or in any other case, Mower would reveal UP's confidential information and trade secrets and would violate, among other things, the attorney-client privilege, the work-product doctrine and Mower's fiduciary duty to preserve confidential information. In particular, UP protested Mower's intention to testify regarding the particular study and position paper discussed in Mower's affidavit in the Idaho case. UP alleged that it would suffer irreparable damage from Mower's disclosure of the position paper or any other confidential information, because such information "may be used . . . in a number of lawsuits against [UP]." UP asked the district court to enjoin Mower from disclosing confidential information in any lawsuit, in order to "prevent a multiplicity of litigation."

Mower objected to UP's complaint on several grounds. Mower argued, among other things, that the information in question—in particular, the study and position paper discussed in his affidavit—was neither confidential nor privileged. He emphasized the publicly available resources he had consulted during the study, including on-line databases and various professionals and academics who were not associated with UP. Mower also contended that the Resignation Agreement's expiration at the end of 1995 left him free to disclose such information, even if confidential or privileged.

The district court granted UP's motion for a preliminary injunction against Mower, finding that the information obtained by Mower during his employment was highly confidential and that Mower owed UP an implied duty of confidentiality.[3] The preliminary injunction read, in relevant part, as follows:

> Based upon the foregoing FINDINGS OF FACT and CONCLUSIONS OF LAW, . . . it is now
>
> ORDERED, ADJUDGED AND DECREED that defendant Mower be and he hereby is RESTRAINED and ENJOINED until otherwise ordered by this court from disclosing or revealing to any person any information or communication of a confidential nature, including the information and communications described in the accompanying findings of fact and conclusions of law, that he ac-

---

**2.** The original complaint also listed Steven M. Rose, one of the attorneys in the Idaho case, as a defendant, but the district court granted Rose's motion to dismiss. The district court correctly determined that Rose's actions were constrained by his ethical obligations as an attorney and, if necessary, by the disciplinary procedures of the Oregon State Bar. *Cf. Brown v. Oregon Dep't of Corrections*, 173 F.R.D. 265 (D.Or.1997) ("[An attorney] may neither ask nor permit a current or former employee to disclose privileged communications."); *see generally* Annotated Model Rules of Professional Conduct Rule 4.2 legal background (1996) (noting that "[i]f the former employee has had extensive exposure to privi-

leged information, ex parte contact may be limited"); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 91–359 (1991) ("With respect to any unrepresented former employee, of course, the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the [attorney-client] privilege.").

**3.** The injunction order also suggested that the testimony in question *might* be subject to one or more evidentiary privileges, but the district court did not issue the injunction on that basis.

quired, learned, or helped to generate during his employment by [UP] or while he was a consultant for plaintiff.

. . . .

This PRELIMINARY INJUNCTION should not be interpreted as foreclosing courts in Colorado or Idaho, where cases are now pending, or courts in other states from ruling upon the admissibility of the evidence referred to herein.

Subject to the foregoing qualification, this PRELIMINARY INJUNCTION shall be binding upon all persons in active concert or participation with defendant Mower or who might seek to cause him to reveal or disclose such information, who have actual knowledge hereof. The district court's findings of fact and conclusions of law focused only on the study and position paper at issue in the Idaho case and did not identify what other information might be of a "confidential nature." In addition, the district court's findings regarding the study and position paper did not address Mower's contention that portions (if not all) of the paper are not properly considered "confidential" because they were available in, and obtained from, the public domain.

Following the district court's grant of the preliminary injunction, UP and Mower stipulated to the issuance of a substantially similar permanent injunction; however, Mower reserved his rights to object to the form of the injunction and to appeal. The district court entered the permanent injunction against Mower on October 14, 1998, and this appeal followed.

## DISCUSSION

■ We review the district court's grant of a permanent injunction "for an abuse of discretion or an erroneous application of legal principles." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1493 (9th Cir.1996). On appeal, Mower argues that the district court erred in concluding that he owes a continuing duty of confidentiality to UP and in issuing an injunction on that basis. Mower also suggests that the district court erred in concluding that the information held by Mower, particularly the study and position paper, was entirely confidential. As explained below, we conclude that the injunction is inappropriate.

### A. *The Implied Duty of Confidentiality and the Resignation Agreement*

■ The district court issued the injunction against Mower based on its conclusion that, "[a]fter his employment and his services as a consultant terminated, defendant Mower remained under an implied duty not to disclose [UP's] confidential business information." The district court reasoned that Mower's duty of confidentiality "goes way beyond any express agreement that expired in 1995, but extends for his lifetime." The district court was correct only if Oregon law recognizes an implied duty of confidentiality and the Resignation Agreement either could not, as a matter of law, or did not, pursuant to its terms, serve to limit Mower's implied duty of confidentiality.[4]

■ Oregon law imposes on every employee a legal duty to protect an employer's trade secrets and other confidential information, an obligation that continues beyond the term of employment. In *McCombs v. McClelland*, 223 Or. 475, 354 P.2d 311 (1960), the Oregon Supreme Court held that ex-employees are under "an implied obligation . . . not to use [their former employers'] trade secrets or confidential information for [their] own benefit or that of third persons. . . ." *Id.* at 483, 354 P.2d at 315–16 (noting that "[t]he law is well settled" on this issue (quoting An-

---

4. Because UP filed its complaint in Oregon district court and based its claim against Mower on that state's common law implied duty of confidentiality, we apply Oregon law to evaluate whether the district court's issuance of the injunction on that basis was appropriate. However, as we note below, *see infra* note 5, Nebraska law governs our interpretation of the terms of the Resignation Agreement.

notation, *Implied Obligation of Employee Not to Use Trade Secrets or Confidential Information for His Own Benefit or That of Third Persons After Leaving the Employment*, 165 A.L.R. 1453, 1454 (1946)) (internal quotation marks omitted)). Thus, the district court properly concluded that Oregon law recognizes an implied duty of confidentiality.

■ However, Oregon also generally permits parties to alter by negotiation duties that would otherwise be governed by state law. In *Owings v. Rose*, 262 Or. 247, 497 P.2d 1183 (1972), for example, the Oregon Supreme Court held that, "where the parties have made an express contract of indemnity[,] its terms will control" despite Oregon's recognition of indemnity actions based on implied contract. *Id.* at 263, 497 P.2d at 1190; *see also Eggiman v. Mid–Century Ins. Co.*, 134 Or.App. 381, 385–86, 895 P.2d 333, 335 (1995) (implied covenant of good faith and fair dealing applies unless altered by the express terms of an agreement); *White's Elecs., Inc. v. Teknetics, Inc.*, 67 Or.App. 63, 67, 677 P.2d 68, 70–71 (1984) ("Absent an agreement to the contrary," an employee has a duty to assign patent rights to an employer.). Therefore, the general rule in Oregon appears to be that parties can "contract out" of implied duties.

Nor is there any indication that the outcome should be different with respect to the particular duty at issue in this case— the implied duty of confidentiality. In *McCombs*, the Oregon Supreme Court gave no indication that the duty of confidentiality should be regarded as inviolate. In fact, in recognizing the existence of this implied duty under Oregon law, the *McCombs* court relied on an American Law Reports annotation that suggests the contrary. *See McCombs*, 223 Or. at 483, 354 P.2d at 315–16. The annotation notes that "the question as to the obligation of a former employee not to reveal . . . confidential information, *where there was an express contract in that regard*, is not

within the scope of the annotation." Annotation, *supra*, at 1454 (emphasis added).

■ We conclude that, under Oregon law, parties have the power to alter the implied duty of confidentiality. The existence of an express agreement is relevant both in determining whether a particular employee is bound by a duty of confidentiality and in defining the scope of that duty. The remaining issue, therefore, is whether the Resignation Agreement affected Mower's implied duty of confidentiality. We believe it did.

■ The Resignation Agreement provided in relevant part:

4. *From now until December 31, 1995:*

(a) You will take no action, nor make any statement which, in the reasonable judgment of [UP's] management, would be harmful or otherwise detrimental to the best interests of [UP], any of its subsidiaries or its stockholders and, subject to your obligations to any future employer, you will use your best efforts to promote the business and affairs of [UP] and all of its subsidiaries in all reasonable ways at your disposal.

(b) You will make no statement or otherwise communicate with anyone with respect to the business or affairs of [UP] or any of its subsidiaries, except as may be (i) approved in writing by [UP] or (ii) required by any judicial or regulatory authority having jurisdiction over the subject matter. . . .

(c) You will remove no documents or other written materials, including copies of any kind, pertaining to the business or affairs of [UP] or any of its subsidiaries from the premises of [UP] and will promptly return to [UP] all such documents or materials now or hereafter in your possession.

5. *From now until December 31, 1995,* you agree that you will not . . . engage in any business of, . . . or consult with, directly or indirectly, any person, firm, corporation or other entity, which

is engaged in the business or practice relating to the assertion of claims or lawsuits against [UP]. . . . You and [UP] agree and acknowledge that you have acquired special knowledge and expertise in the claims and litigation defense strategy used by [UP]. It is the purpose and intention of this agreement to protect [UP's] trade secrets and privileged communications and claims and litigation strategies which you have learned during the course of your employment. It is not the intention of this agreement to restrict your ability to work for a competing railroad or other transportation company, but to protect [UP's] privileged information and strategies from disclosure.

6. This agreement is not a "noncompetition" agreement and shall not prohibit an employment or consulting relationship between you and any railroad, firm or other entity engaged in the business of defending claims and suits, including investigation and negotiation.

(Emphases added).

Although the Resignation Agreement was drafted broadly to prevent Mower from revealing a wide range of information about UP—regardless of whether such information was properly considered "confidential"—it is clear that an intention to protect any confidential or privileged information held by Mower was at the core of the Resignation Agreement and its restrictions on Mower's activities. Surely, if the events spawning this litigation had occurred before the expiration of the Resignation Agreement, UP would have argued that Mower was prohibited (under both paragraphs 4 and 5 of the Resignation Agreement) from discussing the substance of his study and the resulting position paper or probably from even disclosing their existence.

5. The Resignation Agreement stipulated that it was to be construed in accordance with Nebraska law. Accordingly, we must interpret the terms of the Resignation Agreement

Just as clearly, however, the Resignation Agreement limited its protection of such information to a distinct period of time, ending December 31, 1995. The unambiguous meaning of the Resignation Agreement was that, after that date, Mower's obligation to conduct his affairs in accordance with that agreement terminated and he would no longer be subject to its nondisclosure requirements.

UP does not suggest that the terms of the Resignation Agreement were ambiguous. Rather, UP argues that—even if, as we hold today, the implied duty of confidentiality can be altered by contract—the Resignation Agreement merely *supplemented* Mower's pre-existing duty without affecting the protections afforded UP by that duty. UP suggests that to find otherwise would be to add to the agreement rather than to construe it in accordance with its terms.

UP's argument is contrary to applicable principles of contract interpretation. We must give effect to the unambiguous time limitation established by the parties. Under Nebraska law,[5] "a written contract which is expressed in clear and unambiguous language is not subject to interpretation or construction"; and "the meaning of an unambiguous contract presents a question of law." *Lueder Const. Co. v. Lincoln Elec. System,* 228 Neb. 707, 710, 424 N.W.2d 126, 128–29 (1988) (citations omitted). Moreover, "[a] contract must be construed as a whole and, if possible, effect must be given to every part thereof." *Husen v. Husen,* 241 Neb. 10, 13, 487 N.W.2d 269, 272 (1992) (quoting *Crowley v. McCoy,* 234 Neb. 88, 91, 449 N.W.2d 221, 224 (1989)) (internal quotation marks omitted).

In effect, UP's contention is that the Resignation Agreement cannot be read to alter Mower's implied duty of confidentiality because the company would not have entered into the Resignation Agree-

under the laws of the State of Nebraska. *See Fiedler v. Bowler,* 117 Or.App. 162, 166, 843 P.2d 961, 963 (1992) (holding that Oregon courts will enforce choice-of-law provisions).

ment if it had known that, by doing so, it restricted what would otherwise have been a perpetual duty imposed by law. That may or may not be so, but UP's argument neither changes our interpretation of the unambiguous terms of the Resignation Agreement nor overcomes the inappropriateness of the injunction issued against Mower.[6] UP apparently concluded that the value of the information in question would diminish after several years and opted for a blanket, extremely broad prohibition for a term of years as opposed to an indefinite protection against the dissemination of only that specific information properly deemed "confidential" under Oregon law. The fact that UP's choice may have proved unwise does not alter the legal effect of the bargain it made. *See Husen,* 241 Neb. at 14, 487 N.W.2d at 272 ("Although the respondent may be dissatisfied with the bargain [it] made, it is not for this court to rewrite the contract [it] executed.").

We hold, as a matter of law, that the Resignation Agreement supplanted—rather than supplemented—Mower's implied duty of confidentiality. By the terms of the Resignation Agreement, Mower's duty of confidentiality terminated as of December 31, 1995.

### B. *Alternate Grounds for Injunction*

 Not surprisingly, UP argues that we should uphold the injunction even if the district court erroneously determined that Mower remains subject to an implied duty of confidentiality. UP offers

three alternate grounds for the injunction: (1) attorney-client privilege, (2) the work-product doctrine and (3) the privilege for "self-critical analysis." We may affirm on any legitimate basis supported by the record, *see Oregon Short Line R.R. Co. v. Department of Revenue Or.,* 139 F.3d 1259, 1265 (9th Cir.1998), but none of the alternatives proposed by UP is supported here.[7]

 Although UP believes it has established that the information in question is privileged, the record belies UP's contention in several ways.[8] First, we note that the district court was not convinced by UP's argument. During the in camera hearing regarding this matter, the district court stated its belief that it is "a very close question as to whether or not the information that [Mower] obtained . . . would be privileged." And in the injunction order itself, the district court only notes that the study and position paper "might" be privileged. Second, UP has not established a likelihood of success on the merits of any of its claims of privilege sufficient to warrant an injunction. Evidentiary privileges are the subject of state law and, therefore, vary by jurisdiction. The determination whether particular evidence is privileged is a fact-specific inquiry that must be made on a case-by-case basis, applying the law of the state that also will "suppl[y] the rule of decision," Fed.R.Evid. 501. UP's foundational showing during the hearing in this case did not consider the intricacies of the evidentiary

---

**6.** Even if the Resignation Agreement were ambiguous on this point, we would not be persuaded by UP's argument. UP drafted the Resignation Agreement; therefore, we must construe any ambiguities against UP and in accordance with Mower's interpretation, so long as it is reasonable to do so. *See, e.g., Brockley v. Lozier Corp.,* 241 Neb. 449, 463–64, 488 N.W.2d 556, 565 (1992).

**7.** UP's assertion of a self-critical analysis privilege is particularly questionable. This court has not recognized this novel privilege. *See, e.g., Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423, 425–26 (9th Cir.1992).

Nor were we able to discover any Oregon case law adopting, or even discussing, this supposed privilege. *Cf. Cloud v. Superior Court (Litton),* 50 Cal.App.4th 1552, 1558–60, 58 Cal.Rptr.2d 365 (Cal.Ct.App.1996) (concluding that California law does not recognize the self-critical analysis privilege).

**8.** We recognize that the work-product doctrine is not an evidentiary "privilege," *see* Fed.R.Civ.P. 26(b)(3); *Admiral Ins. Co. v. United States Dist. Court,* 881 F.2d 1486, 1494 (9th Cir.1989), but refer to it as such for convenience.

rules of the various trial courts before which it might appear; even if it had, the district court would not have been in a position to evaluate the sufficiency of such a showing. *See Baker v. General Motors Corp.*, 522 U.S. 222, 238, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998) ("[Courts] lack[ ] authority to control courts elsewhere by precluding them ... from determining for themselves what witnesses are competent to testify and what evidence is relevant and admissible in their search for the truth."). Indeed, the district court properly recognized these inherent constraints and fashioned the injunction so as not to foreclose courts in other jurisdictions from "ruling upon the admissibility of the evidence referred to [in the injunction]." Finally, UP fails to recognize that privileges can be waived. We note, without deciding the issue, that UP's short-term protection of its privileges through the Resignation Agreement may have constituted a waiver of any privileges following the expiration of that agreement.

 Furthermore, the injunction issued against Mower cannot be upheld on privilege grounds because it was not crafted in sufficiently precise terms to identify the information being protected. Federal Rule of Civil Procedure 65 requires that an injunction "be specific in terms" and "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). The Supreme Court has explained that "one basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 444, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *see also Schmidt v. Lessard*, 414 U.S. 473,

476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974) ("[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood."). The injunction issued against Mower does not even come close to satisfying Rule 65's specificity requirements; it provides little, if any, guidance to Mower regarding how he should determine what particular information is confidential or privileged.[9] As mentioned previously, the findings of fact and conclusions of law referred to in the injunction specifically identify only a single study conducted by Mower and the related position paper he presented to UP management; those findings of fact and conclusions of law simply state, without detailed inquiry or explanation, that the study and position paper are confidential and "might" be privileged. Even if the study and position paper are confidential or privileged, complete exclusion is not always warranted. *Cf.* Fed.R.Civ.P. 26(c)(7) (allowing courts to issue protective orders that stipulate "that a trade secret or *other confidential research*, development, or commercial information not be revealed *or be revealed only in a designated way*" (emphases added)). More importantly, given the multitude of tasks and subjects Mower must have addressed during his tenure at UP, the injunction's lack of specificity and its reliance on just the study and position paper to support its broad prohibitions are fatal flaws. *Cf. GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210–11 (9th Cir.2000) (explaining that an injunction need not "catalog the entire universe" of its scope but must provide parties with "adequate notice").

9. It is instructive in this regard to consider the detailed showing that is necessary to withhold discovery on privilege grounds. *See* Fed. R.Civ.P. 26(b)(5) ("When a party withholds information ... by claiming that it is privileged ..., the party shall make the claim expressly and shall describe the nature of the documents, communications, or things ... in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.").

## CONCLUSION

Mower's implied duty of confidentiality—whatever its original scope—was superseded by the unambiguous terms of the Resignation Agreement. The Resignation Agreement limited Mower's duty of confidentiality to a distinct time frame, which has since passed. Finding no alternative basis upon which to uphold the injunction, we conclude that the injunction must be REVERSED and VACATED.