

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-30-2004

# Egervary v. Young

Precedential or Non-Precedential: Precedential

Docket No. 02-1284

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Egervary v. Young" (2004). *2004 Decisions*. Paper 733.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/733

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

Nos: 02-1284/2035/2066/2133
_____

OSCAR W. EGERVARY

v.

VIRGINIA YOUNG; JAMES
SCHULER;
FREDERICK P. ROONEY, ESQUIRE;
JAMES J. BURKE, ESQUIRE;
JEFFREY C. NALLIN, ESQUIRE;
JOHN DOES ONE-TEN


Virginia Young,
James Schuler,
Appellants in No. 02-1284 & 02-2066


OSCAR W. EGERVARY,
Appellant in No. 02-2035

v.

VIRGINIA YOUNG; JAMES
SCHULER;
FREDERICK P. ROONEY, ESQUIRE;
JAMES J. BURKE, ESQUIRE;
JEFFREY C. NALLIN, ESQUIRE;
JOHN DOES ONE-TEN

OSCAR W. EGERVARY

v.

VIRGINIA YOUNG; JAMES
SCHULER;
FREDERICK P. ROONEY, ESQUIRE;
JAMES J. BURKE, ESQUIRE;
JEFFREY C. NALLIN, ESQUIRE;
JOHN DOES ONE-TEN


Frederick P. Rooney, Esquire,
James J. Burke, Esquire,
Appellants in No.
02-2133


_____


Appeal from the United States District
Court
for the Eastern District of Pennsylvania
(D.C. Civil Action Nos.96-cv-03039)
District Judge: Honorable Thomas N.
O'Neill, Jr.,

_____


Argued on January 16, 2003

Before: ROTH, FUENTES and
ALDISERT, Circuit Judges


(Opinion filed: April 30, 2004)

Matthew M. Collette, Esquire (**Argued**)
Barbara L. Herwig, Esquire
Robert D. McCallum, Jr.,
Assistant Attorney General

Patrick L. Meehan
United States Attorney
United States Department Of Justice
Civil Division, Appellate Staff, Room 9008
601 D. Street, N.W.
Washington, DC 20530

James W. Gicking, Esquire **(Argued)**
Richard A. Kraemer, Esquire
Marshall, Dennehey & Warner, Coleman & Goggin
1845 Walnut Street, 16th Floor
Philadelphia, PA 19103

Deborah R. Popky, Esquire
Robert S. Tintner, Esquire
Fox Rothschild
2000 Market Street, 10th Floor
Philadelphia, PA 19103

        Counsel for Appellants/Cross Appellees

Gary L. Azorsky, Esquire **(Argued)**
Casey Preston, Esquire
Berger & Montague
1622 Locust Street
Philadelphia, PA 19103

        Counsel for Appellee/Cross-Appellant

---

O P I N I O N

---

ROTH, Circuit Judge:

This appeal in a <u>Bivens</u>[1] action arose out of an international child custody dispute. Aniko Kovacs, a citizen and resident of Hungary, wanted to regain custody of her son, Oscar Jonathan Egervary (Oscar). The father, Oscar W. Egervary (Egervary), had taken Oscar from Hungary to Pennsylvania without Kovacs' permission. Frederick Rooney, a private attorney acting at the request and with the assistance of U.S. State Department officials, agreed to represent Kovacs in a proceeding to regain custody of Oscar. Pursuant to the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601, <u>et seq.</u>, Rooney presented a petition to a United States District Judge at an <u>ex parte</u> hearing. During this hearing, Rooney argued successfully for the issuance of an order permitting him to enlist the aid of local law enforcement officials and U.S. Marshals in seizing and removing Oscar from the United States without notice to Egervary. It is now clear that minimal due process required notice and an opportunity to be heard. For that reason, the <u>ex parte</u> order was unconstitutional insofar as it permitted Oscar's removal from the United States without providing Egervary with either a pre- or post-deprivation hearing.

As a result of his son's removal,

---

[1]<u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971)

2

Oscar W. Egervary brought a <u>Bivens</u> action to recover monetary damages from Rooney as well as from his associate, James Burke, his local counsel, Jeffrey Nallin, and the two State Department officials, Virginia Young and James Schuler, who assisted Rooney in this matter.[2] The District Court granted summary judgment to Nallin but found triable issues as to the other four defendants. We granted permission to appeal. Because the order entered by the District Judge in the underlying ICARA proceeding was a superseding cause of Egervary's injury, we conclude that Egervary is unable to establish in this <u>Bivens</u> suit that the actions of the defendants in the custody proceeding proximately caused his harm. Thus, we will reverse the District Court's denial of summary judgment to Rooney, Burke, Young, and Schuler, and we will affirm on alternative grounds its grant of summary judgment to Nallin.

## I. Facts

Plaintiff Oscar W. Egervary is a native of Hungary, who emigrated to the United States in 1980 and became a citizen in 1987. He became romantically involved with fellow Hungarian Aniko Kovacs in 1990 while she was studying in

---

[2]Adopting the terminology used by the District Court, we will refer to Rooney, Burke, and Nallin collectively as the "Attorney Defendants," and will identify Young and Schuler as the "Federal Defendants."

the United States. They were married in Hungary in 1991 and established their residence in New Jersey. Their son, Oscar, was born in New Jersey in July 1992.

In February 1993, Kovacs took Oscar with her on a trip to Hungary. Although they were scheduled to return to the United States in early April, Kovacs twice delayed the return trip and then informed Egervary that neither she nor Oscar would return at all. After attempts to reconcile the relationship had failed, Kovacs sent a "farewell" letter to Egervary in September 1993, stating that she and Oscar were moving to an undisclosed location within Hungary. In December of that year, Egervary went to Budapest and located Kovacs and Oscar. He took Oscar from Kovacs, against her will, and returned with him to Monroe County, Pennsylvania.

Kovacs instituted legal proceedings in Hungary seeking Oscar's return. As a result, the Hungarian government contacted the U.S. State Department in order to obtain its assistance. On or about May 10, 1994, Young, a member of the State Department's Bureau of Consular Affairs, asked Rooney to file an ICARA petition on behalf of Kovacs. By his own admission, Rooney "was not extremely well-versed on the Hague." Nevertheless, he agreed to represent Kovacs <u>pro bono</u>. During the course of this representation, Rooney was in regular contact with officials at the State Department and routinely received assistance from them. The assistance provided by the Federal

Defendants included, inter alia, providing the Attorney Defendants with (1) copies of Hungarian governmental and court documents related to the case, as well as model ICARA pleadings published by the American Bar Association; (2) information regarding Oscar's location; and (3) advice on the proper preparation of the ICARA pleadings. Rooney did not have any direct contact with his client, Kovacs.

The model pleadings Rooney received from the Federal Defendants contained three separate proposed orders, all of which provided for an ex parte proceeding prior to the seizure of the child, followed by a post-deprivation hearing at which the alleged parent-kidnapper could be heard. Although Rooney used the model pleadings as the basis for his ICARA petition, he added a fourth option that would permit law enforcement officials to take Oscar "into protective custody . . . and deliver him to [Rooney] for immediate return to the physical custody of [Kovacs]." Thus, the fourth option did not provide for a post-deprivation hearing.

The Attorney Defendants filed the ICARA petition in the United States District Court for the Middle District of Pennsylvania on May 13, 1994. The petition contained all four proposed orders. In presenting the petition to the District Court during the ex parte proceeding, Rooney argued for the fourth option, the one he had drafted himself and the only one that did not call for a hearing prior to Oscar's removal from the United States.

No court reporter was present during the ex parte proceedings so that no transcript exists. However, both Rooney and the judge were deposed in connection with the Bivens action, and both discussed their recollection of what transpired. Although Rooney and the judge agree on most points, some discrepancies exist.

Specifically, both generally agree that the judge expressed reservations as to whether he had the authority to grant the fourth option (i.e., whether he could order that the child be removed from the United States without providing at least a post-deprivation hearing for the father). In view of this doubt, Rooney then called the State Department from the judge's chambers during a break in the proceedings. Rooney spoke to Schuler and asked him whether the judge had the authority to issue such an order. According to Rooney's deposition testimony, Schuler said something to the effect, "He's the judge. He can do whatever he feels is appropriate." Based on this representation from Schuler, Rooney apparently told the judge that Rooney believed the judge did in fact have the legal authority to enter such an order.

The discrepancies between Rooney's and the judge's accounts do not involve any factual aspect of the custody matter but only the legal limits of the judge's ability to act on the undisputed facts. The discrepancies center around the discussion of the ICARA pleadings and the representations made by Rooney

4

regarding his relationship and contacts with the State Department. With respect to the ICARA pleadings, Rooney states that he and the judge discussed all four alternatives and that the judge mentioned that it was Friday and it might be difficult to contact anyone from child protective services to take custody of Oscar. Rooney also states that he told the judge that, if the fourth option was granted, Rooney would personally take Oscar to Hungary. However, the District Court in this Bivens action has summarized the judge's testimony as follows: "Rooney: 1) portrayed himself as representing the State Department; 2) stated that he was seeking to have the Judge enforce a Hungarian court order; 3) had already made arrangements to return the child to Hungary that day; and 4) never suggested any remedy that would require [the] Judge . . . to conduct a hearing on the matter."

In addition, the judge has stated that, although the other three options (all of which provided for an ex parte proceeding before the seizure of the child and then a post-deprivation hearing) were contained in the papers, they were not discussed by Rooney, who argued only for the fourth option. The judge also stated that he selected the fourth option based on what he believed to be the State Department's representation, made through Rooney, that he had the legal authority to do so:

> And as I say – maybe it's too much trust, but you're inclined to rely on the expertise of a federal department that purportedly has expertise in that area. But I did have qualms about it. I mean, I just didn't sit down and sign it. I said I want you to get an assurance that this is the appropriate thing to do.

Despite these concerns, the judge eventually entered an order selecting the Fourth Option, directing law enforcement officers to "take into protective custody OSCAR JONATHAN EGERVARY and deliver him to Petitioner's agent for immediate return to the physical custody of Petitioner" (hereinafter "the Order").

Once the Order had been signed by the judge, Rooney and Burke sought out U.S. Marshals to execute it. Upon arriving at the District Marshal's office, Rooney placed a call to the State Department to notify them of what had transpired. Rooney and Burke then followed the Deputy Marshals to Egervary's residence but did not enter the home with them. When Oscar had been removed from the residence, he was placed in Rooney's car and driven to Newark International Airport. According to Burke's testimony, Rooney was in constant contact with the State Department both during the trip to the airport and throughout the rest of the day.

During the trip to the airport, Rooney also contacted Lori Mannicci, an associate in his office, and asked her to arrange for Oscar's return to Hungary.

5

This not only involved making the necessary travel arrangements, but also obtaining permission from the State Department to remove Oscar from the United States without a passport. According to Mannicci's testimony, she does not remember either the name of the person with whom she spoke or the content of their conversation. However, she does have handwritten notes from the conversation that include Young's home phone number. Once the passport waiver was obtained, Rooney flew with Oscar to Frankfurt, Germany. Kovacs met them there, and Rooney turned over custody of Oscar to her at that time.

Following Oscar's removal from the United States, Egervary filed a motion for reconsideration of the Order. Egervary subsequently withdrew this motion and filed the Bivens action.

## II. Procedural History

Egervary filed his original complaint in the United States District Court for Eastern District of Pennsylvania on April 17, 1996. Pursuant to Bivens, he seeks compensatory and punitive damages, together with interest, attorney's fees, and costs from defendants Young, Schuler, Rooney, Burke, Nallin, and John Does One through Ten (the John Does are alleged to be agents or representatives of the State Department). The complaint contained both (1) a substantive Bivens claim alleging that the defendants violated Egervary's Fifth Amendment Due Process rights by taking custody of his son without a hearing, and (2) a conspiracy count.

The Federal Defendants filed a motion to dismiss and to stay discovery. On January 7, 1997, the District Court stayed discovery but declined to rule on the motion to dismiss because of concerns as to whether venue was appropriate in the Eastern District of Pennsylvania. The court therefore granted Egervary leave to file a motion to transfer the case to the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1406(a) within 30 days, noting that the court would grant the Federal Defendants' motion to dismiss if Egervary failed do so.

Egervary timely moved to transfer. On April 28, 1997, the case was transferred to the Middle District and assigned to the judge who had issued the Order in the ICARA matter. However, it soon became clear that that judge might be called as witness. Thus, all of the judges in the Middle District recused themselves, and a District Judge from the District of Delaware was designated to hear the case.

The Federal Defendants again moved to dismiss the claims asserted against them, and this motion was granted by the new judge on August 17, 1998. Following the dismissal of these defendants, Egervary filed an unopposed motion to have the case transferred back to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404. This motion was granted and a new District Judge was assigned to the case.

Once back in the Eastern District of Pennsylvania, the Attorney Defendants

moved for summary judgment. They asserted that there was no violation of Egervary's due process rights and that, even if such a violation had occurred, his Bivens claim against them failed on grounds of waiver, collateral attack, lack of damages, and immunity.

The District Court denied the motion on January 21, 2000, concluding that minimal due process required that Egervary be given either a pre- or post-deprivation hearing. In the order accompanying the January 21 Opinion, the court gave the Attorney Defendants twenty days to submit briefs explaining why the court should not enter summary judgment in favor of Egervary with respect to the issue of liability. In reply, the Attorney Defendants asserted that they were not acting as federal agents and, in the alternative, that their defense of good faith precluded summary judgment.

Relying upon our decision in Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250 (3d Cir. 1994), the District Court's August 15, 2000, opinion focused on the Attorney Defendants' participation in the execution of the Order. The court concluded that Nallin was not acting as a federal agent because he did not participate in the execution of the Order. However, because Rooney and Burke did participate in the Order's execution, the District Court ruled that there was sufficient evidence for a jury to find that they were acting as agents of the federal government during the commission of the acts which were at the heart of the due process violation suffered by Egervary. The court further held that, pursuant to Jordan, Rooney and Burke could assert a good faith defense to the claims asserted by Egervary. Finally, the court concluded that the issue of good faith presented a jury question so that the issue of liability could not be resolved at the summary judgment stage.

Discovery continued and Rooney and Burke were both deposed, with Rooney's testimony revealing a number of facts not previously known to either Egervary or the court. Specifically, Rooney testified that:

> 1) defendant Young asked Rooney to represent Kovacs and sent him Hungarian government documents regarding the alleged abduction and model ICARA pleadings; 2) while he was preparing the ICARA petition he consulted with the State Department "a bunch of times"; 3) someone from the State Department had called [the] Judge ['s] . . . office that morning to inform the Court that a petition was going to be filed; 4) he spoke with Schuler while he was in [the] Judge['s] . . . chambers in order to confirm that the child could be removed from Egervary's custody and returned to Hungary without a hearing; and 5) the State

7

Department arranged for a waiver of the child's passport so that he could be removed immediately from the country.

Based on this new evidence, Egervary moved for leave to amend his complaint to again include the Federal Defendants, asserting that there was no longer any basis for their dismissal from the case. The District Court granted this motion on March 6, 2001.

Egervary filed his amended complaint on March 23, 2001. The Federal Defendants again moved to dismiss and, prior to receiving a ruling on this motion, also moved for summary judgment based on their lack of personal involvement in the actions giving rise to Egervary's claim.

The District Court's September 6, 2001, opinion rejected the Federal Defendants' arguments and denied their motion for summary judgment. A subsequent order issued on January 17, 2002, denied the Federal Defendants' motions to dismiss and for summary judgment for the reasons stated in the September 6, 2001, Opinion

The District Court then certified the following orders for immediate appeal pursuant to 28 U.S.C. § 1292(b): (1) the January 17, 2002, Order denying the Federal Defendants' motions to dismiss and for summary judgment; (2) the January 21, 2000, Order denying the

Attorney Defendants' motions for summary judgment; (3) the August 15, 2000, Order granting summary judgment as to Nallin and denying Egervary's motion for summary judgment with respect to the issue of liability; (4) the March 6, 2001, Order granting Egervary leave to file an amended complaint reasserting his claims against the Federal Defendants; and (5) the March 23, 2001, Order denying the Federal Defendants' motion for reconsideration of the March 6, 2001, Order.

On January 25, 2002, the Federal Defendants appealed the District Court's January 17, 2002, Order denying their motions to dismiss and for summary judgment with respect to the issue of qualified immunity. Subsequently, on January 28, they filed a petition for permission to present additional issues on appeal pursuant to 28 U.S.C. § 1292(b). Egervary filed a similar petition the same day, and the Attorney Defendants filed a petition for permission to appeal three days later. On March 6, 2002, the Clerk's Office consolidated the three petitions for permission to appeal and submitted them for our review. On April 5, 2002, we granted the petitions and each appeal was then transferred to the General Docket.[3]

---

[3]Upon being transferred to the General Docket, the Federal Defendants' petition for permission to appeal (C.A. No. 02-8055) became C.A. No. 02-2066, Egervary's petition for permission to appeal (C.A. No. 02-8006) became C.A. No. 02-2035, and the Attorney

These three appeals were then consolidated and submitted to us for decision on the merits.

## III. Jurisdiction

These consolidated appeals involve a cause of action brought to remedy alleged constitutional violations pursuant to the Supreme Court's decision in Bivens. As such, the District Court exercised subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331. We have jurisdiction over the Federal Defendants' appeal of the District Court's decision regarding qualified immunity pursuant to 28 U.S.C. § 1291. Our jurisdiction over the remainder of the issues certified for appeal is premised on 28 U.S.C. § 1292(b).

"As the text of § 1292(b) indicates, appellate jurisdiction applies to the order certified to the court of appeals, and is not tied to the particular question formulated by the district court." Pollice v. National Tax Funding, L.P., 225 F.3d 379, 388 (3d Cir. 2000) (citation and internal quotations omitted). Thus, "[w]e may address 'any issue fairly included within the certified order because it is the order that is appealable, and not the controlling question identified by the district court.'" Id. (quoting Abdullah v. American Airlines, Inc., 181 F.3d 363, 366 (3d Cir. 1999)); see also Ivy Club v. Edwards, 943 F.2d 270, 275 (3d Cir. 1991). This plainly

Defendants' petition for permission to appeal (C.A. No. 02-8007) became C.A. No. 02-2133.

includes the threshold question of whether Egervary has established a prima facie case under Bivens.

## IV. Standard of Review

Where, as here, "we have jurisdiction to review an order rejecting qualified immunity at the summary judgment stage, our review of the order is plenary." Eddy v. Virgin Islands Water & Power Auth., 256 F.3d 204, 208 (3d Cir. 2001). We similarly exercise plenary review over all other issues decided on summary judgment. Chisolm v. McManimon, 275 F.3d 315, 321 (3d Cir. 2001). In so doing, we apply the same test applied by the District Court. Id. Thus, "[s]ummary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)).

## V. Discussion

Defendants raise a number of defenses to the claims asserted against them, including lack of venue, waiver, absolute immunity, qualified immunity, and good faith. However, we need not reach any of these issues, as we conclude that Egervary, by failing to demonstrate proximate cause with respect to any defendant, has failed to establish an

essential element of his claim.[4]

We begin our analysis with the self-evident principle that, because Bivens actions are simply the federal counterpart to § 1983 claims brought against state officials, see Brown v. Philip Morris, Inc., 250 F.3d 789, 800 (3d Cir. 2001), and because tort law causation analysis serves as the basis for determining causation in § 1983 actions, see Hector v. Watt, 235 F.3d 154, 160 (3d Cir. 2001) (citing Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000)), tort law causation must govern our analysis of this Bivens claim. Thus, as in any tort case, Egervary must demonstrate that defendants' actions were the proximate cause of the harm he suffered.

Traditionally, in tort law, "proximate cause" has been defined as a person's wrongful conduct which is a substantial factor in bringing about harm to another. See Restatement (Second) of Torts § 431 (1965). However, an intervening act of a third party, which actively operates to produce harm after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable for the harm which his antecedent wrongful act was a substantial factor in bringing about. See Restatement (Second) of Torts § 440-441 (1965).

This concept has been recognized in cases such as the one before us. Courts have held that, under certain circumstances, the actions of a judicial officer may sever the chain of causation. For example in Hoffman v. Halden, 268 F.2d 280 (9th Cir. 1959), overruled in part on other grounds, Cohen v. Norris, 300 F.2d 24 (9th Cir. 1962), the plaintiff alleged that the defendants had violated his civil rights by wrongfully committing him to a state mental institution. In examining the proximate cause issue, the court held that it was the order of the court, not the preliminary steps taken to obtain it, that was the proximate cause of the injury:

> In a Civil Rights conspiracy case, the injury and damage must flow from the overt acts. Where the gravamen of the injury complained of is commitment to an institution by court order, this order of the court, right or wrong, is ordinarily the proximate cause of the injury. Various preliminary steps occur before the order is made. These preliminary steps may range from such matters as filing of petitions to the various clerical and procedural activities which lead to the order. In the ordinary case, the order is made after a hearing in

---

[4]Because the merits of the underlying custody dispute are not before us, we also need not address the complex residency issues we have discussed in Delvoye v. Lee, 329 F.3d 330 (3d Cir. 2003).

10

court or after consideration by the court of the supporting documents and evidence. Therefore, the various preliminary steps would not cause damage unless they could be said to be the proximate cause of the injury. <u>In the usual case, the order of the court would be the proximate cause and the various preliminary steps would be remote causes of any injury from imprisonment or restraint under the court order</u>.

268 F.2d at 296-97 (emphasis added).

Over time, the law in this area has developed around the general principle that the decision of an independent intermediary "will only constitute an intervening cause if the decision is genuinely free from deception or coercion." <u>Hector</u>, 235 F.3d at 164 (citing cases from the Second, Fifth, Seventh, Eleventh, and D.C. Circuits) (Nygaard, J., concurring).

We had an opportunity to consider this issue, albeit in a somewhat different context, in <u>Hector</u>. There, the plaintiff, following the suppression of evidence seized by Pennsylvania state troopers and the dismissal of charges against him, brought a § 1983 action against the troopers based on their alleged violation of his Fourth Amendment rights. <u>See</u> 235

F.3d at 155. The troopers asserted several defenses to these claims, including the argument that the independent decisions of the prosecutor and grand jury to indict the plaintiff "were superceding or intervening causes that broke the causal connection between the Fourth Amendment violation and Hector's subsequent expenses in mounting a legal defense." <u>Id.</u> at 160.

Although Judge Nygaard would have reached the proximate cause issue in <u>Hector</u>, <u>see id.</u> at 161-65 (Nygaard, J., concurring), the majority found it unnecessary to do so in view of its resolution of the other arguments raised by the defendants, electing instead to leave a more thorough analysis of our stance with respect to the relevant proximate cause question for another day. <u>See id.</u> at 161. Because the threshold inquiry into proximate cause is outcome determinative in this case, we now accept the invitation to delve deeper into this issue. In so doing, we begin, as Judge Nygaard did in <u>Hector</u>, with the Fifth Circuit Court of Appeals' decision in <u>Hand v. Gary</u>, 838 F.2d 1420 (5th Cir. 1988).

<u>Hand</u> involved allegations of malicious prosecution against a deputy sheriff. The Fifth Circuit Court of Appeals, rejecting the plaintiff's claim, held that "'even an officer who acted with malice in procuring the warrant or the indictment will not be liable if <u>the facts</u> supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or grand jury, for that intermediary's 'independent' decision

'breaks the causal chain' and insulates the initiating party.'" Id. at 1427 (quoting Smith v. Gonzales, 670 F.2d 522, 526 (5th Cir. 1982)). However, as the Ninth Circuit did in Hoffman, the Fifth Circuit in Hand cautioned that, in order for the chain of causation to be broken, the independent intermediary must be presented with all of the facts; "[a]ny misdirection . . . by omission or commission perpetuates the taint of the original official behavior." Id. at 1427-28. Applying this ruling to the facts presented in Hector, Judge Nygaard concluded that the chain of causation had been broken and that the officers should not be held liable for damages incurred following the initial detention. See Hector, 235 F.3d at 165 (Nygaard, J., concurring).

Egervary contends, however, that if we rule that the ex parte Order constituted a superseding cause, our decision would run counter to the Supreme Court's decision in Malley v. Briggs, 475 U.S. 335 (1986). Malley was a § 1983 action in which plaintiffs claimed that a state trooper, in applying for warrants to arrest them, had violated their rights under the Fourth and Fourteenth Amendments because the complaint and supporting affidavit failed to establish probable cause. The District Court directed a verdict for the trooper because the act of the judge in issuing the arrest warrants had broken the causal chain between the filing of the complaint and the arrests and because the trooper was entitled to immunity under the "objective reasonableness" standard of Harlow v. Fitzgerald, 457 U.S. 800

(1982). The First Circuit Court of Appeals reversed, holding that an officer who seeks an arrest warrant by submitting a complaint and affidavit is not entitled to immunity unless the officer has an objectively reasonable basis for believing that the facts alleged in the affidavit are sufficient to establish probable cause. Briggs v. Malley, 748 F.2d 715 (1st Cir.1 1984). The Supreme Court granted certiorari to review the First Circuit's application of the "objective reasonableness" standard in the context of the entitlement to immunity. Malley, 475 U.S. at 339. The causation issue was not included in the grant of certiorari. After determining that a policeman is not entitled to absolute immunity for causing an arrest warrant to be issued, Id. at 341-42, the Court then concluded that qualified immunity, with its "objective reasonableness" standard, was sufficient protection for an officer applying for a warrant. Id. at 343-44. At this point, the Court added a footnote, commenting in dictum that Malley had not pressed the break in the causal chain argument, which the Court found to be "inconsistent with our interpretation of § 1983," adding:

> As we stated in Monroe v. Pape, 365 U.S. 167, 187 . . . (1961), § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Since the common law recognized the causal link between the submission

12

of a complaint and an ensuing arrest, we read § 1983 as recognizing the same causal link.

*Id.* at 345 fn 7. This comment brings us around full circle to traditional tort concepts of independent, intervening cause. To the extent that the common law recognized the causal link between a complaint and the ensuing arrest, it was in the situation where "misdirection" by omission or commission perpetuated the original wrongful behavior. <u>See</u>, <u>e.g.</u>, <u>Hand</u>, 838 F.2d at 1428-29. If, however, there had been an independent exercise of judicial review, that judicial action was a superseding cause that by its intervention prevented the original actor from being liable for the harm. <u>See</u> Restatement of Torts (Second) § 440 (1965) ; <u>Hoffman</u>, 268 F.2d at 296-97; <u>Townes v. City of New York</u>, 176 F.3d 138, 147 (2d Cir. 1999). Thus, the cryptic reference to the common law in <u>Malley</u>'s footnote 7 would appear to preclude judicial action as a superseding cause only in the situation in which the information, submitted to the judge, was deceptive.

Egervary also cites case law from other circuits to argue that, because each of the defendants allegedly participated in one way or another in making representations to the District Judge prior to the execution of the Order, all of the defendants should be held liable for the subsequent deprivation of his rights.[5] These cited cases, however, are not inconsistent with the conclusion we reach above. The cited cases include <u>Zahrey v. Coffey</u>, 221 F.3d 342, 353-54 (2d Cir. 2000) (holding that the chain of causation was not broken where the prosecutor allegedly fabricated evidence); <u>Warner v. Orange County Dep't of Probation</u>, 115 F.3d 1068, 1072-73 (2d Cir. 1997) (concluding that the neutral, advisory role played by probation officers prevented the chain of causation from being broken where the sentencing judge adopted a recommended sentence which violated a criminal defendant's constitutional rights); <u>Lanier v. Sallas</u>, 777 F.2d 321, 324-25 (5th Cir. 1985) (holding that a judge's decision to commit plaintiff to a mental health facility did not sever the chain of causation where that decision was based in part on a misrepresentation made by defendants).

---

[5]Egervary makes this argument in his Rule 28(j) submission. Federal Rule of Appellate Procedure 28(j) states, in relevant part, that "[i]f pertinent and significant authorities come to a party's attention after the party's brief has been filed — or after oral argument but before decision — a party may promptly advise the circuit clerk by letter, with a copy to all other parties, setting forth the citations." Because Egervary's submission complies with the requirements of this Rule, Rooney and Burke's motion to strike it will be denied.

13

The purported misrepresentation here, however, is a legal one and not an inadequate or false representation of the factual basis upon which the legal ruling depended. In addition, although Rooney and the other defendants urged the District Judge to conclude that he had the legal authority under ICARA to enter the requested order on an ex parte basis,[6] they also included the three constitutionally valid forms of order in the petition they presented. Moreover, it is axiomatic that, in any given case, the responsibility for determining the governing law and procedures lies with the judge. Indeed, this is a judge's primary responsibility. Thus, the cases cited by Egervary – most of which involve instances in which judicial officers applied the correct law but nevertheless issued unconstitutional orders or warrants as a result of being misled in some way as to the relevant facts[7] – are inapplicable if, as here, the judge fails in the primary judicial duty of identifying the legal principles and procedures which govern the dispute.

---

[6]We note that the District Judge testified during his deposition that he believes Rooney acted in good faith and did not purposely mislead him:

> [Counsel]: Your Honor, was it your belief that Mr. Rooney was acting in the good faith belief that no hearing was required in this situation to enforce that order?
>
> [Judge]: Yes. I wouldn't expect him to trick me or lie to me, you know, I mean, he's responsible – he made a great impression, he's a responsible person.
>
> [Counsel]: And you believe that he had a good faith belief in what he was telling you?
>
> [Judge]: That would be my conclusion, yes.

Nealon Dep. at 67-68.

---

[7]The one exception to this statement is the Second Circuit's decision in Warner, where the court concluded that, "[g]iven the neutral advisory role of the probation officer toward the court, it [wa]s an entirely natural consequence for a judge to adopt the [Probation Department's] recommendations as to a therapy provider without making an independent investigation of the qualifications and procedures of the recommended provider. Such action by a judge is neither abnormal nor unforeseen." 115 F.3d at 1073 (citations and internal quotations omitted). However, Warner is readily distinguishable on this basis. Although appearing in a partisan capacity clearly does not relieve attorneys of their ethical and professional obligations, judges should "know[] that scrutiny is warranted." Id. at 1072.

14

The issue presented here of a legally erroneous court ruling is analogous to that faced by the Second Circuit Court of Appeals in Townes. There, the plaintiff filed a § 1983 claim against New York City and several of its police officers after having been convicted of weapons- and drug-related charges on the basis of evidence obtained in violation of the Fourth Amendment. In analyzing the proximate cause issue on appeal, the court concluded that, "as a matter of law, the unconstitutional seizure and search of Townes's person was not a proximate cause of his conviction because of (at least) one critical circumstance: the trial court's refusal to suppress the evidence, which is an intervening and superseding cause of Townes's conviction." 176 F. 3d at 146. Although it was clear to the court that, "but for the defendants' unreasonable seizure and search, Townes's handguns and cocaine would have gone undetected (at least for the time being), and he would not have been convicted of the precise offenses under these precise circumstances," it nevertheless concluded that "the trial court's failure to suppress the evidence concerning Townes's own criminal acts constituted a superseding cause of Townes's conviction and imprisonment." Id. at 147. In so holding, the court reasoned:

> The state trial court, which alone had the power to suppress the improperly obtained evidence, had control over the ultimate outcome of Townes's case.

That court should have recognized that the defendants violated Townes's clearly established Fourth Amendment rights, and should have suppressed the evidence under the fruit of the poisonous tree doctrine, as the Appellate Division later ruled. The state trial court's exercise of independent judgment in deciding not to suppress the evidence, though later ruled to be erroneous, broke the chain of causation for purposes of § 1983 liability for the plaintiff's conviction and incarceration.

Id. See also Duncan v. Nelson, 466 F.2d 939, 942 (7th Cir. 1972) (affirming the District Court's ruling that a plaintiff may not pursue a cause of action against police officers for unconstitutional conduct in extracting his confession because the trial court's failure to suppress the confession amounted to a superseding cause of the harm they suffered).

Thus, we see that the chain of causation was broken in Townes when the trial court committed an error of law unrelated to the conduct of the defendant police officers. We conclude that the same general principle applies in this case. Simply stated, because minimal due process required providing Egervary with

15

an opportunity to be heard prior to Oscar's removal from the United States, there is no set of facts under which the Order issued by the District Judge was proper. Indeed, because the judge failed to properly ascertain the relevant law and procedures prior to issuing the Order – a responsibility which was his and his alone – defendants' arguments on the form of order the judge should adopt are insufficient to establish proximate causation. No statement or omission by defendants could possibly have made the issuance of such an order appropriate. Rather, the judge's execution of an order permitting Oscar's removal from the United States without either a pre- or post-deprivation hearing amounted to an error of law for which the judge alone was responsible.

To sum up, we adhere to the well-settled principle that, in situations in which a judicial officer or other independent intermediary applies the correct governing law and procedures but reaches an erroneous conclusion because he or she is misled in some manner as to the relevant facts, the causal chain is not broken and liability may be imposed upon those involved in making the misrepresentations or omissions. See, e.g., Hand, 838 F.2d at 1427-28; Hector, 235 F.3d at 164 (citing cases) (Nygaard, J., concurring). However, we draw a distinction between that situation and the facts as presented both here and in Townes, where the actions of the defendants, while clearly a cause of the plaintiff's harm, do not create liability because of the intervention of independent judicial review, a superseding cause. We conclude that where, as here, the judicial officer is provided with the appropriate facts to adjudicate the proceeding but fails to properly apply the governing law and procedures, such error must be held to be a superseding cause, breaking the chain of causation for purposes of § 1983 and Bivens liability. Cf. Sheppard v. E.W. Scripps Co., 421 F.2d 555, 558 (6th Cir. 1970) (concluding that any deprivation of a criminal defendant's rights in a high profile murder case was a result of the manner in which the judge conducted the trial, thus breaking the chain of causation); Whittington v. Johnston, 201 F.2d 810, 811-12 (5th Cir. 1953) (holding that attorney-defendant's role in instituting commitment proceedings was not the proximate cause of the due process violation suffered by the plaintiff where the presiding judge elected not to provide the plaintiff with notice and an opportunity to be heard).

Moreover, we reject Egervary's argument that our decision in Jordan requires that liability be imposed on defendants for their alleged participation in the execution of the Order after it had been entered by the District Judge. Jordan involved the execution of a confessed judgment by private attorneys, without a pre-deprivation hearing. See Jordan, 20 F.3d at 1264-67. In the case before us, to the contrary, the defendants obtained an order from an independent judicial officer. Jordan is clearly distinguishable. Here, as Egervary conceded at oral argument, none

of the post-hearing actions taken by defendants violated the terms of the District Judge's Order and none would have been possible without the issuance thereof. Thus, because the judge's execution of the <u>ex parte</u> Order superseded any prior tortious conduct by defendants and shrouded any subsequent actions with a cloak of legitimacy, we find no basis for imposing <u>Bivens</u> liability on any of the defendants.

This is not to say that we condone behavior in which an attorney urges the court to make an erroneous decision or fails to properly investigate the facts or governing law before presenting them to the court. However, such actions or omissions would neither excuse judges from their responsibility to correctly ascertain the relevant law and procedures nor would they create civil liability on the part of others for errors of law committed by judges.

Finally, we note that neither the District Judge's error in granting the Order nor the defendants' actions in seeking and executing it left Egervary without a remedy in the underlying case. Egervary initially filed a motion for reconsideration of the <u>ex parte</u> Order. He could have pursued this motion, and, if it were denied, appealed the ruling. A reversal by this Court then would have permitted Egervary to enlist the aid of the State Department in obtaining Oscar's return. He instead chose to withdraw his motion for reconsideration and pursue the <u>Bivens</u> claim. While it was clearly his right to do so, he is now left with the consequences of that decision.

## VI. Conclusion

For the reasons stated above, we will reverse the District Court's denial of summary judgment to Rooney, Burke, Young, and Schuler, and remand this case to the District Court with directions to enter summary judgment in their favor. The District Court's grant of summary judgment to Nallin will be affirmed on the alternative grounds discussed above. Rooney and Burke's motion to strike Egervary's Rule 28(j) submission will be denied.

17