NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2038
_____

PURE EARTH, INC.

v.

GREGORY W. CALL

v.

PURE EARTH, INC.; MARK ALSENTZER; BRENT KOPENHAVER

Gregory W. Call,
                                        Appellant
_____

On Appeal from United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-09-cv-04174)
(District Judge: Honorable Legrome D. Davis)
_____

Argued December 11, 2014
Before:  FUENTES, FISHER, KRAUSE, *Circuit Judges*.

(Opinion Filed: July 2, 2015  )

Natalie D'Amora, Esq.
David H. Marion, Esq.
Stella M. Tsai, Esq.  ***ARGUED***
Archer & Greiner
1650 Market Street
One Liberty Place, 32nd Floor
Philadelphia, PA 19103
                    *Counsel for Appellant*

Bruce S. Marks, Esq. **ARGUED**
Thomas C. Sullivan, Esq.
Marks & Sokolov
1835 Market Street
28th Floor
Philadelphia, PA 19103
　　　　　　*Counsel for Appellees*

_____

OPINION[*]

_____

FISHER, *Circuit Judge*.

Gregory W. Call appeals an order of the United States District Court for the

Eastern District of Pennsylvania entering judgment in favor of Pure Earth, Inc., Mark

Alsentzer, and Brent Kopenhaver. We will affirm.

I.

We write principally for the parties, who are familiar with the factual context and

legal history of this case. Therefore, we will set forth only those facts that are necessary

to our analysis.

This case arises from a merger, memorialized in a Stock Purchase Agreement

("SPA"), entered into in March 2007 between Pure Earth, Inc. ("PEI") and Gregory W.

Call. Call was the majority owner of three companies that engaged in waste management,

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

2

disposal, and recycling activities. PEI operated companies that provided diversified environmental services. Call sold his companies to PEI in exchange for, among other things, PEI stock and cash.

When Call sold his companies, PEI represented and warranted that "[e]xcept as set forth in Schedule 7.8 (a), no Proceeding involving, or related to Buyer or Buyer's business is currently pending." J.A. 81. The SPA defined "proceedings" broadly. At the time the parties signed the SPA, a New York City Business Integrity Commission ("BIC") monitor had been in place to observe and investigate PEI's business for at least the prior thirteen months. The monitor BIC had placed at PEI had broad authority, including the power to compel testimony under oath, require production of documents, and access all personnel files.

The BIC investigates and makes determinations on registration applications for companies seeking to engage in hauling waste or other debris in New York City. A BIC registration is important to a business's ability to operate in the New York City market; it allows a company to become exempt from other licensing requirements that apply to businesses hauling other types of waste.

Schedule 7.8 of the SPA listed three "proceedings" and five "judgments" involving Juda, a PEI subsidiary, but did not identify the presence of the BIC monitor at Juda as a "proceeding." On November 29, 2007, Juda attempted to withdraw its application for renewal of its registration with the BIC. Despite this withdrawal attempt, the BIC considered the application and denied Juda renewal of its registration. PEI,

however, continued to do business in 2008 and 2009 in New York City without Juda's BIC license by contracting with independent trucking companies that had BIC licenses. On June 28, 2010, the BIC published its report; it is at this time that Call learned of the results of the BIC's investigation denying the renewal of the registration. In the interim, a number of other negative events affected PEI, including the end of a multi-million dollar project, a struggle to find financing at a reasonable rate, and an unrelated lawsuit. At this point, PEI's stock price had dropped and the shares that Call held were less valuable than they had been at signing or closing.

In September 2009, PEI filed suit against Call, seeking indemnification of losses incurred as a result of alleged breaches of warranties in the SPA. Call filed a counterclaim and third-party claims asserting breach of contract, breach of warranty, and securities fraud. He claimed that he was tricked into signing the SPA on the basis of material misrepresentations regarding the BIC investigation, a multi-million dollar contract, and the business PEI would generate for Call's companies.

At the first trial, the District Court found that Call had breached six warranties that he made in the SPA, resulting in losses to PEI totaling $895,000, but that PEI could not recover from Call because it materially breached the SPA by failing to disclose the BIC investigation into Juda. Finally, the District Court found that Call could not prevail on his claims because he had presented no evidence of damages and loss causation to support his securities fraud claim. Call then appealed a pre-trial ruling granting in part PEI's motion to exclude the report and testimony of Call's expert, Stephen Scherf.

4

On appeal, this Court held that it was error to exclude Scherf's report and testimony. *Pure Earth, Inc. v. Call*, 531 F. App'x 256, 261 (3d Cir. 2013). The District Court then held a bench trial limited to the issues of loss causation and damages, with factual findings from the first trial remaining on the record. The District Court found that Call's evidence relating to loss causation and damages was not reliable, not credible, and ultimately unpersuasive. The District Court found in favor of the counterclaim and third-party defendants on Call's claims. Call appealed.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a trial court's conclusions of law. *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 515 (3d Cir. 2012). We review a District Court's findings of fact, however, for clear error. *Am. Soc'y for Testing & Materials v. Corrpro Cos., Inc.*, 478 F.3d 557, 566 (3d Cir. 2007).

## III.

Call raises two issues on appeal. First, whether the District Court applied the proper legal standards for proving non-typical loss causation and damages. We conclude that it did. Second, whether the District Court properly ruled that Call did not meet his burden of proving loss causation and damages. On this question, we conclude that the District Court did not err. Thus, we will affirm the District Court's order.

### A.

Call first contends that the District Court did not utilize the proper standard for

5

determining loss causation in a non-typical securities fraud case. There are two types of private securities fraud cases: typical cases and non-typical cases. Typical securities fraud cases involve a plaintiff who alleges that "a fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security, with the plaintiff investing in reliance on the misrepresentation or omission." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007). Non-typical private securities fraud cases are those where a fraudulent statement or omission in connection with the purchase or sale of a security allegedly causes economic loss.

Both types of cases require that a private plaintiff prove the same six elements, one of which is a causal connection between the material misrepresentation and the loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *McCabe*, 494 F.3d at 424. This "causal connection" is usually called "loss causation," *Dura Pharm., Inc.*, 544 U.S. at 342, and has been codified in the Private Securities Litigation Reform Act, which requires that "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

This proximate cause concept requires a "sufficient causal nexus between the loss and the alleged [nondisclosure]." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 177 (3d Cir. 2001) (alteration in original) (internal quotation marks omitted). "The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable

6

outcome of the fraudulent statement." *McCabe*, 494 F.3d at 430-31 (internal quotation marks and alteration omitted).

After its review of its factual findings pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the District Court examined the evidence as it pertained to loss causation. It began by reciting the appropriate standards—the substantial factor test, the causal nexus, and the principles of causation. The District Court continued by demonstrating that it understood the different standards, stating that "[w]hile typical loss causation requires proof of 'fraud on the market,' meaning that a defendant made material misrepresentations or omissions that affected the price of a publicly traded stock, non-typical loss causation involves claims alleging that misrepresentations to a plaintiff induced that plaintiff to enter into a private transaction." J.A. 22.

The District Court proceeded to analyze Call's evidence in the context of this non-typical loss causation standard, writing that "Scherf was an unreliable and unpersuasive witness and he did not convince us that the failure to disclose the BIC investigation was a substantial factor in the alleged loss," and that "Call has failed to establish directness and that the loss he suffered was not the result of one or more intervening causes." J.A. 23-24, 25. The District Court thus properly utilized general principles of causation, such as materiality, directness, foreseeability, and intervening causes.

Regardless of its substantive conclusion on loss causation, the District Court identified the correct precedent, utilized that precedent to assess Call's evidence, and made a conclusion couched in the requirements of that precedent. Therefore, we hold that

7

the District Court used the proper standard when it analyzed Call's evidence of loss causation.

B.

Call next argues that the District Court did not use the proper standard for evaluating damages. In a non-typical securities fraud case, damages are "the difference between the price paid for a security and the security's 'true value'" at the time of purchase. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir. 1991). A plaintiff must prove what the security's value would have been, absent the material misrepresentation or omission. However, these damages cannot be "too speculative, vague or contingent" upon some unknown factor. *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998).

Call argues that the District Court did not apply this standard. He contends that the District Court required Scherf to perform a typical securities fraud damages analysis. The District Court began by quoting this Court's opinion in Call's first appeal, stating that Call had to establish the difference in the securities' value when he acquired the shares and the value they would have had if the misrepresentation had been known. The District Court went on to quote the proper damages standard and then launched into its substantive analysis of Call's evidence on damages.

Far from requiring Call to conduct a damages analysis which isolated and disentangled other factors that might have affected the price of the stock over the course of time, the District Court carefully assessed whether Call presented sufficient evidence

8

to meet his burden of proving damages that were not too speculative, vague, or contingent.

Call refers to a portion of the District Court's opinion when he alleges that it used the wrong standard. The District Court wrote that "Scherf . . . failed to credibly isolate the BIC investigation misrepresentation from the other three misrepresentations he considered" and that "Call also failed to present reliable evidence to show the Court that it was the BIC investigation that caused his alleged loss—as opposed to the other events that plagued PEI after the SPA was signed." J.A. 25. These statements, however, appear in the portion of the District Court's opinion that was discussing whether Call met his burden on loss causation, not in the discussion of damages. Call's argument and quotations are inapplicable.

Because the District Court cited correct precedent and used this precedent consistently throughout its discussion of damages, we hold that the District Court used the correct damages standard.

## C.

Call also appeals the District Court's determination that he did not meet his burden of proof for establishing loss causation based on the evidence he introduced.

The District Court made a number of findings of fact pursuant to Rule 52(a) during the trial, which we review for clear error. *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009). None of these findings is clearly erroneous given the evidence introduced at trial. They each have a credible evidentiary basis—they are supported by evidence

9

introduced in the record that is cited after each finding of fact. The District Court's determinations of credibility are well-supported and explained. Each has a rational relationship to the supporting data.

We review de novo the District Court's conclusion that Call did not bear his burden to show that the BIC investigation was a proximate cause of his loss. To assess whether Call has provided sufficient evidence of loss causation, we look to general principles of causation, including materiality, directness, foreseeability, and intervening causes. *McCabe*, 494 F.3d at 436.

Call did introduce some evidence that the loss of the BIC license caused the decline in the value of the PEI shares. For example, he demonstrated that before turning in the BIC license, Juda did just under 40% of PEI's trucking. After turning in its BIC license, PEI used independent trucking companies, for which it sometimes had to pay a premium. In addition, PEI was originally intended to operate based on a full-service business model, which was impossible without the BIC license. Each of those facts indicate that the loss of the BIC license may have caused at least a portion of Call's loss.

These facts, however, are inconclusive. Call did not introduce evidence of the overall financial effect of, in some cases, having to pay a premium to independent trucking companies. He did not demonstrate that the switch from a full-service to brokerage model necessarily caused a negative financial impact that directly resulted in his loss. Finally, he did not demonstrate that Juda's financial performance was material to PEI's overall financial performance, and Scherf "[did] not show that the omission

10

proximately caused the economic loss" and did not offer a credible opinion on "whether the . . . misrepresentations of [PEI] proximately caused the decline of values in the [PEI] shares after the merger." *McCabe*, 494 F.3d at 437-38. Scherf's evidence relevant to directness was not credited by the District Court, and Scherf was unable to opine as an expert that the decrease in profits were the result of Juda turning in its BIC license. He did not establish the actual financial effect of the loss of the BIC license or the changing business model. In short, Scherf gave no credible testimony relevant to the issues of directness and materiality. Thus, Call was not able to introduce credible evidence at trial that supported his theory. His demonstration of proximate cause suffers accordingly.

In addition, we must examine "whether [Call's loss] was a foreseeable outcome" of PEI's misstatement. *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006). Call fares somewhat better here. The District Court found that Juda was responsible for somewhat less than 40% of PEI's trucking and that a significant amount of PEI's business came from the New York City market. These facts make it foreseeable that if there would be an effect on the business from losing the BIC license, that effect would be a negative financial impact. As discussed above, however, Call did not introduce evidence that there was a foreseeable direct negative financial effect on PEI from losing the BIC license that caused his shares to decline in value. No expert witness that the District Court found credible testified as to the foreseeability of Call's loss.

Finally, the existence of any intervening causes is relevant to the proximate cause analysis. "[A]n intervening act of a third party, which actively operates to produce harm

11

after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable for the harm which his antecedent wrongful act was a substantial factor in bringing about." *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004). In this case, the District Court found that Call did not present reliable evidence that the end of a major project, an unrelated lawsuit, and financing troubles might have been the causes of PEI's financial demise. Call argues that the District Court erred because the burden of proof to show the existence of superseding causes lies with the defendant. We need not reach the question of who bears that burden here, however, because we only consider superseding causes when the plaintiff shows that an "antecedent wrongful act was a substantial factor in bringing about" harm. *Egervary*, 366 F.3d at 246. Here, Call failed to introduce credible evidence that the wrongful acts alleged were a substantial factor in causing his loss, so that we need not consider the presence of superseding causes and we conclude that Call did not meet his burden of proof to demonstrate proximate cause.

D.

Call finally appeals the District Court's determination that he did not meet his burden of proof for establishing damages. We review these findings of facts for clear error, *Am. Soc'y*, 478 F.3d at 566, which occurs when a finding of fact is "completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *Tracinda*, 502 F.3d at 230.

To prove damages "Call needed to prove what the value of the PEI stock in March 2007 would have been if the facts of the BIC investigation were known at that time." *Pure Earth*, 531 F. App'x at 261. These calculations cannot be too speculative, vague, or contingent. *ATACS*, 155 F.3d at 669. "As a general rule, plaintiffs alleging securities fraud rely on expert testimony to establish both the fact of damage and the appropriate method of calculation." *Sowell*, 926 F.2d at 301. The District Court made findings of fact that are relevant to whether Call sufficiently proved the value of the PEI stock at the time of closing in March 2007.

Scherf presented no reliable opinions about the value of the PEI stock at the applicable time; he stated that he believed the value of the PEI shares on May 27, 2010 was the same as the true value they had at closing in March 2007; and he performed an unsophisticated analysis and did not introduce evidence that explained this valuation or justified it. In sum, Scherf's valuation was arbitrary, unsupported by reliable analysis, and irreconcilable with the evidence. The evidence is too speculative and vague for Call to carry his burden of proof.

In addition, Scherf's testimony does not explain why PEI was able to continue its other operations after Juda turned in its BIC license. This unrebutted fact casts doubt on his conclusion that the risk of losing Juda's license made the PEI shares worthless at closing. Finally, Scherf contradicted his expert report at trial. None of these findings are clearly erroneous given the evidence introduced at trial. Call was unable to establish with any level of certainty the true value of the PEI shares at the time of the transaction. He

has not introduced certain or logical analyses from which this Court can determine the value of what he received from PEI. Thus, he has failed to establish damages for the purposes of his securities fraud claim.

E.

Finally, to prove a breach of contract claim under Pennsylvania law, a party must establish the existence of a contract, a breach of the duty imposed by the contract, and damages resulting from that breach. *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). Call proved the first two elements of this claim at the first trial, but because we hold that Call has not proven damages, we also affirm the District Court's judgment against Call on the contract claim.

IV.

For the reasons set forth above, we will affirm the order of the District Court.