**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4624
_____

ALFRED PATTERSON;
DEBORAH PATTERSON, H/W,

Appellants

v.

JOSEPH C. STRIPPOLI,
COUNCILMAN FOR THE BOROUGH
OF LINDENWOLD;
BOROUGH OF LINDENWOLD
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. No. 1-12-cv-04688)
District Judge: Hon. Robert B. Kugler
_____

Argued: November 10, 2015
_____

Before: CHAGARES, SHWARTZ, and RENDELL, Circuit Judges.

(Filed: January 20, 2016)

Thomas Bruno, Esq. [ARGUED]
Abramson & Denenberg, P.C.
1315 Walnut Street, 12th Floor
Philadelphia, PA 19107

    Counsel for Appellants

John C. Gillespie, Esq. [ARGUED]
Parker McCay P.A.
9000 Midatlantic Drive, Suite 300
P.O. Box 5054
Mount Laurel, NJ 08054

     Counsel for Appellee

_____

OPINION[*]
_____

SHWARTZ, <u>Circuit Judge</u>.

Deborah and Alfred Patterson allege that their neighbor, Councilman Joseph Strippoli, used his position to cause the selective enforcement of Lindenwold, New Jersey ordinances against them, in violation of the Equal Protection Clause. The District Court granted Strippoli's motion for summary judgment. For the reasons set forth herein, we will affirm in part and reverse in part.

I

The Pattersons, an interracial married couple, have resided at 412 East Elm Avenue in Lindenwold since March 2003.[1] Since June 2006, they have owned and operated a recycling business through which they provide trash disposal and site clean-up, including the removal of scrap metal and glass, from residences and businesses. The

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[1] Deborah Patterson is Caucasian. Alfred Patterson is African-American.

2

Pattersons assert that they do not operate the business from their home, but concede that Alfred Patterson often returned to the property with materials he planned to take to the landfill or that he intended to refurbish and sell. Alfred Patterson also testified that he sometimes "sort[s] through" items in his backyard, and that on one occasion, he cut metal beams on the property. R. 646.

Strippoli has resided at 401 East Linden Avenue since 1985. The corner of his backyard abuts the Pattersons'. He served as the mayor of Lindenwold from 1988 through 1991 and has been a Councilman since 1999. Strippoli lodged complaints about the Pattersons with the police and code enforcement department many times. Strippoli also admits taking pictures of the Pattersons' yard to document ordinance violations; helping to initiate a petition among local residents to "shut down the Junk Yard Business at 412 E. Elm Avenue," R. 1378; authoring a proposed amendment to the property maintenance code to "make it more clear" that junkyards are prohibited in residential areas, R. 123; and frequently complaining about the Pattersons' yard to the mayor and other Council members, including Councilman Justin Jackson, the Council's liaison to the borough's code enforcement department.

Between July 2004 and April 2012, Lindenwold police and code enforcement officers visited the Pattersons' property more than two dozen times to investigate alleged ordinance violations, including the accumulation of junk and rubbish in the Pattersons' yard and excessive noise. The Pattersons were cited for such conduct on multiple

occasions, and admitted to more than twenty violations. The Pattersons were also twice cited, on December 2, 2011, and April 9, 2012, for having a portable basketball hoop on their front curb, in violation of a sports equipment ordinance prohibiting such placement.[2] Five of the Pattersons' neighbors, none of whom were interracial couples, but who also had basketball hoops on the curb, were not cited before the Pattersons filed this lawsuit.[3]

The Pattersons assert that Strippoli fixated on their property for discriminatory reasons, citing several racially offensive comments he allegedly made. Another Councilman, Kenneth Balmer, testified that he once heard Strippoli say, with reference to Deborah Patterson, that he did not understand "why she married a black guy like that."[4] R. 145. Former Lindenwold Mayor Frank DeLucca testified that Strippoli asked him more than once "how would you like that black SOB living next door to you." R. 231-32. Deborah Patterson herself testified that when she confronted Strippoli taking pictures of the yard in 2008, and asked him what his problem was, he responded "well, what are

---

[2] The ordinance specifically prohibits sports equipment "from being used in and on [a] public street," including "basketball" and "[g]oals and other type[s] [of] netting." R. 1050. The purpose of the ordinance is to prevent children from playing sports in the street, which can be dangerous and obstruct traffic. According to Al Hallworth, the Lindenwold official in charge of code enforcement, the sports equipment ordinance was not normally enforced unless children were in the street and, under such circumstances, everyone on the block would receive a citation.

[3] Between August 3, 2011 and July 26, 2012, twenty-eight citations were issued to other property owners for violations of the sports equipment ordinance.

[4] Balmer also testified that on one occasion he heard Strippoli remark that a person who had arrived late to a borough meeting was on "CPT," or "colored people's time." R. 145. Strippoli admitted using this phrase.

4

you doing married to a black man like that."  R. 388-89.

On July 26, 2012, the Pattersons filed a complaint pursuant to 42 U.S.C. § 1983

alleging that Strippoli used his position as a Councilman to cause the selective

enforcement of the borough's ordinances against them "based on their status as an

interracial couple" ("Count I"), and without any "rational basis" ("Count II"), in violation

of the Equal Protection Clause of the Fourteenth Amendment.[5]  R. 1447-48.  Finding that

the Pattersons failed to adduce sufficient evidence showing that they were treated

differently from similarly situated Lindenwold property owners, the District Court

granted Strippoli's motion for summary judgment on both claims.  The Pattersons appeal.

## II[6]

### A

The Pattersons claim that Strippoli has violated their equal protection rights since

2004 by causing police and code enforcement officers to visit their home and issue

citations.  The first issue we must address is whether they may seek relief for conduct that

---

[5] The Pattersons also filed a due process claim against Strippoli and a Monell claim against the borough, but do not appeal the dismissal of these claims.

[6] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.  We have jurisdiction under 28 U.S.C. § 1291.  We exercise plenary review of the District Court's grant of summary judgment and apply the same standard it applied, under which summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014) (internal quotation marks and citation omitted).  The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

occurred up to eight years before they filed their complaint. The statute of limitations for § 1983 claims in New Jersey is two years. O'Connor v. City of Newark, 440 F.3d 125, 126-27 (3d Cir. 2006). The Pattersons attempt to avoid this two-year limitation period by relying on the continuing violations doctrine. Under this doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred."[7] Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks and citation omitted). This doctrine operates as a type of tolling and is often applied to address injuries that are the "collective result of many non-actionable" slights. Major Tours, Inc. v. Colorel, 799 F. Supp. 2d 376, 387 n.3 (D.N.J. 2011); see also O'Connor, 440 F.3d at 128 (stating that the doctrine is designed to address situations in which the plaintiff's claim is "based on the cumulative effect of a thousand cuts"). "[I]ndividually actionable allegations," even if relatively minor, however, "must be raised within the applicable limitations period." O'Connor, 440 F.3d at 127. Because a selective prosecution claim under the Equal Protection Clause may be established by "a single discriminatory act," Bohen v. City of East Chicago, Ind., 799 F.2d 1180, 1186-87 (7th

---

[7] The continuing violations doctrine is most often applied to hostile work environment claims, where not every act or remark itself is actionable but the series of actions gives rise to a claim based on the aggregate wrongs. Major Tours, Inc. v. Colorel, 799 F. Supp. 2d 376, 388 (D.N.J. 2011).

Cir. 1986), the claim based on it accrues at the time of the discriminatory or irrational enforcement action. See O'Connor, 440 F.3d at 127; Major Tours, 799 F. Supp. 2d at 389 (holding that discrete acts of racial profiling in violation of plaintiffs' equal protection rights cannot be aggregated under the continuing violations doctrine because every time such an act occurs, "a cause of action arises," and that to hold otherwise "would undermine the grave import of such racial discrimination"). Thus, enforcement actions that pre-date July 26, 2010 are time-barred and we will affirm the District Court's statute of limitations ruling.[8]

B

We now turn to the merits of the Pattersons' § 1983 claims. To establish liability under § 1983, a plaintiff must show that the defendant, acting under color of law, violated the plaintiff's federal constitutional or statutory rights and caused injury. Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005). The parties do not dispute that Strippoli was acting at all relevant times as a Councilman, and thus he was acting under color of law.[9]

_____

[8] Although these earlier incidents do not provide a basis for relief, they may provide "background evidence in support of" the Pattersons' timely filed claims if the District Court deems them admissible. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).

[9] Prior to oral argument, Strippoli did not challenge the District Court's finding that he was acting under color of law. While he describes himself in the summary of argument portion of his brief as a neighbor who did nothing in his official capacity to cause harm to the Pattersons, he does not assert anywhere in his brief that he was not a state actor or otherwise reference the District Court's ruling to that effect. Rather, his arguments address whether he had the authority to cause the Pattersons to be cited and whether the independent actions of other Council members and code enforcement

7

The Pattersons allege that Strippoli violated their federal constitutional equal protection rights by causing the selective enforcement of the borough's ordinances. A plaintiff may pursue an equal protection selective enforcement claim under a traditional theory, which protects a plaintiff from discriminatory treatment based on membership in a protected class. See D'Altilio v. Dover Twp., Civ. No. 1:06-CV-1931, 2007 WL 2845073, at *8 (M.D. Pa. Sept. 26, 2007). In contrast, a plaintiff may pursue an equal protection claim under a "class of one" theory by showing that a state actor treated him differently from similarly situated individuals without a rational basis for the different treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); PG Publ'g Co. v. Aichele, 705 F.3d 91, 114 (3d Cir. 2013). Such a plaintiff need not show he was a member of a protected class or that he was treated differently for an impermissible reason, such as race. See D'Altilio, 2007 WL 2845073 at *10.

The Pattersons advance both theories. In Count I, they argue that Strippoli discriminated against them based on race. In Count II, they lodge a class of one claim, asserting that Strippoli caused the selective enforcement of borough ordinances against them with "no rational basis." R. 1448.

Both theories require a showing that similarly situated people were treated differently. The Pattersons urge us to conclude that the "similarly situated" persons here

officers eliminate any liability he might have. Thus, the state actor ruling is not before us.

8

are "all Lindenwold property owners." Appellant Br. 39-40. We decline to adopt this view. "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" Startzell v. City of Phila., 533 F.3d 183, 203 (3d Cir. 2008) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). While the Pattersons and all other Lindenwold property owners are similar insofar as they are property owners in the same borough, such a broad interpretation of the "similarly situated" requirement ignores relevant distinctions between the Pattersons and property owners who did not violate borough ordinances. We therefore agree with the District Court that the "similarly situated" persons here are other Lindenwold property owners deserving of "the attention of the police and/or code enforcement officers for the condition of their properties." App. 21.

We must next determine whether there is a genuine issue of material fact that the Pattersons were treated differently from other similarly situated Lindenwold property owners. The Pattersons assert that they were treated differently because they were subject to the enforcement of borough ordinances related to the accumulation of debris on their property, excessive noise, and the presence of a basketball hoop on the curb when others were not. With respect to the first two categories, we conclude that the Pattersons failed to present sufficient evidence that they were treated differently from similarly situated persons. Notably, the Pattersons do not identify any other Lindenwold homeowners who violated the debris or noise ordinances but were not visited or cited by

9

the police or code enforcement officers.  Cf. Olech, 528 U.S. at 565 (concluding that plaintiff had established different treatment because she showed that defendant "demanded a 33-foot easement as a condition of connecting her property to the municipal water supply" but "required only a 15-foot easement from other similarly situated property owners").  Indeed, the record shows that code enforcement officers conducted "hundreds" of property inspections for alleged violations of borough ordinances during the relevant time period, the "overwhelming majority" of which resulted in citations, including citations for the same or similar debris and noise conduct for which the Pattersons were cited.  R. 1268.  For this reason, summary judgment on both Counts I and II, to the extent those counts are based on selective enforcement of the debris or noise ordinances, is appropriate.[10]

The Pattersons have, however, produced evidence from which a jury could find that they were treated differently with respect to the sports equipment ordinance.  Five households in the Pattersons' neighborhood, in the vicinity of Strippoli's home, also maintained basketball hoops on the curb and were not cited for a violation before the

---

[10] Our colleague would let a jury consider the Pattersons' claim that the debris and noise ordinances were unequally enforced against them based on Geinosky v. City of Chicago, 675 F.3d 743 (7th Cir. 2012).  Geinosky, however, is distinguishable.  Whereas the plaintiff in that case received twenty-four "bogus" parking tickets, all of which were ultimately dismissed as illegitimate, id. at 745, the Pattersons admitted to more than twenty ordinance violations, including numerous violations related to debris and noise.

Pattersons filed this lawsuit, while the Pattersons were cited twice. R. 1443-44.[11]

Although the five households were cited for sports equipment violations after the Pattersons filed this lawsuit, such subsequent citations are not probative of whether the Pattersons were treated differently before the suit was filed. Cf. Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1129 (9th Cir. 2000); Lam v. Univ. of Hi, 40 F.3d 1551, 1561 n.17 (9th Cir. 1994); Rich v. Martin Marietta Corp., 522 F.2d 333, 346 (10th Cir. 1975) ("If post filing conduct is to be taken into account at all, it might tend to show the existence of prior discrimination and an effort to repair the harm after discovery."); see also Holcomb v. Iona College, 521 F.3d 130, 143 (2d Cir. 2008) (a fact finder may view post-lawsuit hiring of a minority as a way of concealing prior discrimination); Gonzales v. Police Dep't, City of San Jose, 901 F.2d 758, 761-62 (9th Cir. 1990) (subsequent hiring actions not relevant to whether discrimination occurred before lawsuit was filed and noting decisions from the Courts of Appeal from the Fifth and Sixth Circuit concluding that post-law suit actions do not constitute a defense to or moot a discrimination claim). In sum, the fact that these five households were subsequently

---

[11] Strippoli also disputes that these five households are his immediate neighbors, and points out that twenty-eight citations were issued in Lindenwold for violations of the sports equipment ordinance between August 3, 2011, a few months before the Pattersons' first sports equipment citation, and July 26, 2012, the date of the filing of their complaint, R. 1319-22. Whether this suggests that Strippoli was unaware of the five households in the neighborhood who also violated the ordinance and/or that the Pattersons' citations are not indicative of selective treatment is a jury question.

11

cited does not defeat the Pattersons' equal protection claim.

We next consider whether there is sufficient evidence that any different treatment related to the enforcement of the sports equipment ordinance was based on race or lacked a rational basis. To succeed on their race-based selective enforcement equal protection claim set forth in Count I, the Pattersons must show that they are members of a protected class, that they were treated differently from members outside that class, and that the different treatment was motivated by race. See Bradley v. United States, 299 F.3d 197, 205-06 (3d Cir. 2002). This requires proof that the defendant engaged in purposeful discrimination. Based on a review of the record, we conclude that there is sufficient evidence, if credited by a jury, to support such a claim. First, it is undisputed that the Pattersons are part of a protected class as an interracial couple, and that those who were not cited for a sports equipment violation, and reside in the general vicinity of Strippoli's house, were not. Second, the Pattersons have adduced evidence from which a jury may conclude that Strippoli harbors racial animus. Councilman Balmer testified that Strippoli verbally questioned "why [Deborah Patterson] married a black guy like that," R. 145, and former Mayor DeLucca testified that Strippoli asked him more than once "how would you like that black SOB living next door to you," R. 231-32.[12] Deborah Patterson testified that when she confronted Strippoli attempting to photograph ordinance

---

[12] Councilman Balmer testified, and Strippoli admitted, that Strippoli used the racially offensive term "CPT." R. 124, 145.

12

violations in her yard, and asked him what his problem was, he responded "well, what are you doing married to a black man like that." R. 388-89. From these facts, a reasonable jury could conclude that Strippoli was motivated by a racially discriminatory purpose in lodging complaints with the police, code enforcement department, and other members of the Lindenwold Council about the Pattersons' property, and that he caused the Pattersons to be cited for violating the sports equipment ordinance.[13] Accordingly, we will reverse the grant of summary judgment on Count I, only insofar as it is based on the selective

_____

[13] There is sufficient circumstantial evidence from which a jury could find Strippoli caused the Pattersons to be cited. Though both code enforcement officers who issued the basketball hoop citations testified that Councilman Justin Jackson informed them of the violations, Strippoli admitted to complaining about the Pattersons to Jackson "a half dozen times." R. 107. In addition, Deborah Patterson testified that when Robert Fort, a newly-hired code enforcement officer, arrived at her home to issue the April 9, 2012 basketball hoop citation, he told her that Strippoli had called him.

Strippoli disputes this, arguing that the "independent" actions of the code enforcement officers broke the chain of causation between himself and the Pattersons' alleged injuries and thus eliminate his liability. Appellee Br. 35. While Strippoli is correct that "an intervening act of a third party, which actively operates to produce harm after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable," Egervary v. Young, 366 F.3d 238, 246 (3d Cir. 2004), the conduct of the third party "will only constitute an intervening cause if the [third party's act] is genuinely free from deception or coercion," id. at 247 (quoting Hector v. Watt, 235 F.3d 154, 164 (3d Cir. 2000) (Nygaard, J., concurring)). Here, there is sufficient evidence from which a jury could find that the code enforcement officers' sports ordinance citation decisions were not free from Strippoli's coercion, and thus his causation argument fails. According to Fort, Strippoli asked him to investigate the Pattersons' property shortly after he assumed the job. Fort further testified that "[Strippoli] had me follow him over to [the Pattersons'] house and showed me the violations from his yard," and told Fort that "if [he] didn't take care of the violations on the Patterson property, [he] could end up like the other two previous code enforcement officers," who no longer worked for the borough. R. 11.

enforcement of Lindenwold's sports equipment ordinance against the Pattersons based on race.

We now turn to Count II, the Pattersons' "class of one" claim. As indicated previously, plaintiffs "state[] a claim for violation of the Equal Protection [C]lause when [they] allege[] that [they] ha[ve] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006) (internal quotation marks and citation omitted). The rational basis standard for a "class of one" claim sets a high hurdle for plaintiffs, requiring a showing of different treatment that is "irrational and wholly arbitrary." Eichenlaub v. Twp. of Ind., 385 F.3d 274, 286 (3d Cir. 2004) (quoting Olech, 528 U.S. at 565).

As already discussed, the Pattersons were twice cited for violating the sports equipment ordinance and five of their neighbors who also placed basketball hoops at the curb were not until this lawsuit was filed. Even though the record shows twenty-eight similar citations in Lindenwold during the period before the Pattersons filed their complaint, the record is unclear as to why these five homes, which are within a few blocks of the Pattersons' home, and hence in Strippoli's general neighborhood, were not cited, but the Pattersons were. Because no explanation has been provided for this discrepancy, a reasonable jury could conclude that there was no rational basis for it. Thus, we will reverse the order granting summary judgment on the Pattersons' class of

14

one claim only insofar as it asserts the discriminatory enforcement of the sports equipment ordinance.

## III

For the foregoing reasons, we will affirm the District Court's statute of limitations ruling, affirm in part and reverse in part the order granting Strippoli's motion for summary judgment, and remand for proceedings consistent with this opinion.

## Patterson v. Strippoli

### No. 14-4624

---

**RENDELL**, <u>Circuit Judge</u>, *concurring in part and dissenting in part*.

I agree with the majority that the Pattersons have adduced sufficient evidence that the sports equipment ordinance was unequally enforced against them, and that remand is appropriate. I must dissent in part, however, because I would let a jury, on remand, hear the Pattersons' claims that the other town ordinances were likewise unequally enforced against them.

The majority believes that the Pattersons must identify with more specificity a similarly situated person who was treated differently from the Pattersons with respect to each town ordinance. I disagree because I view the instant fact pattern as similar to one considered by the Court of Appeals for the Seventh Circuit, in which the court held that when a state actor treats a person in a truly extraordinary way, a court can infer that similarly situated persons were treated differently. *See Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012). In *Geinosky*, the plaintiff alleged that his equal protection rights were violated by having received 24 baseless parking tickets over a fourteen-month period. *Id.* at 745. Even though the plaintiff in *Geinosky* did not allege that a similarly situated person had not received a similar number of baseless tickets, the court found that he had plausibly alleged an equal protection violation, as one could infer that others were not receiving a similar number of baseless tickets. *See id.* at 748 ("Geinosky's general allegation that defendants 'intentionally treated plaintiff differently than others similarly

situated' is sufficient here, where the alleged facts so clearly suggest harassment by public officials that has no conceivable legitimate purpose. To require more would elevate form over substance."). In other words, the extraordinary nature of the pattern of conduct alleged—amounting to harassment—allowed the court to infer that similarly situated persons were not receiving the same extraordinary treatment.

Viewed in the light most favorable to the Pattersons, the record here, similarly, reveals an extraordinary pattern of harassment and targeted enforcement of several town ordinances against the Pattersons because of the obsessive, racially motivated conduct of Strippoli. The majority acknowledges the salient evidence of Strippoli's racial animus against the Pattersons, but then downplays the fact that this animus was part of an obsession that a jury could find necessarily resulted in unequal treatment of the Pattersons. Strippoli's actions in his vendetta went beyond uttering offensive words about the Pattersons. There is evidence in the record that Strippoli went so far as to (a) threaten the job of a code enforcement officer if he didn't issue more citations to the Pattersons, *see* R. 11, 75; (b) take away another code enforcement officer's access to the town truck for his failure to issue more citations to the Pattersons, *see* R. 256; and (c) urge the Police Chief to stake out the Pattersons' home and then pull over Mr. Patterson for driving a car with what Strippoli suspected to be an expired registration, *see* R. 338-40.

Witnesses who knew Strippoli testified regarding the extraordinary nature of his actions. A former mayor of Lindenwold testified that Strippoli's feud with the Pattersons was "the talk of the borough hall," R. 229—it's no stretch to conclude that when a councilman's vendetta against you is the "talk of the borough hall," you are being singled

2

out for unequal treatment. Indeed, a colleague of Strippoli's on the town council testified that he felt Strippoli was abusing his power in his treatment of the Pattersons, and that Strippoli was *not* abusing his power with respect to any other town residents. *See* R. 148.

A jury could find that his abuse of power manifested itself in the unequal enforcement of the town ordinances against the Pattersons. The majority accepts that there is sufficient evidence of unequal enforcement of the basketball hoop ordinance against the Pattersons, (which, in my view, suggests that other ordinances were likewise unequally enforced—after all, Strippoli's obsession was not limited to the Pattersons' basketball hoop), but the majority fails to credit the evidence in the record showing that several other ordinances were also unequally enforced against the Pattersons. Mrs. Patterson testified in her deposition that some of her neighbors had unregistered vehicles on their properties and never received a citation, whereas the Pattersons did receive a citation for that offense. R. 441. Mayor DeLucca testified that he and "half the town probably" had some junk in their backyards, implying that not everyone with junk in their backyards was being cited for it—at least not as often as the Pattersons were. R. 231. Indeed, photographs in the record show many yards in the neighborhood contained junk. *See* R. 1468-1504; Nov. 23, 2015 Letter from Thomas Bruno, II. By cross-referencing the list of photographed addresses with the list of citations, one can see that at least two other yards containing junk were cited only once and at least one yard containing junk was not cited at all. *Compare* Nov. 23, 2015 Letter from Thomas Bruno, II *with* R. 1278-1325. Meanwhile, the Pattersons were cited no fewer than nine times for violating various rubbish, junk, and abandoned vehicle ordinances. *See* R. 1278-1325. Perhaps this

3

treatment was unequal—or perhaps not—and perhaps it has a legitimate explanation and was not motivated by racial animus—or perhaps not. These issues are for a jury to decide. I believe they should do so, and therefore respectfully dissent in part.